STANFORD MOTOR COMPANY, A PARTNERSHIP, APPELLEE, V.
EDMUND J. WESTMAN, APPELLANT.
39 N. W. 2d 841

Filed December 1, 1949.   No. 32656.

*Johnson & Johnson, Schaper & Schaper,* and *Chambers, Holland & Groth,* for appellant.

*Evans & Lee,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an action at law brought by the Stanford Motor

Company, a partnership, against Edmund J. Westman. The action was brought in the district court for Custer County. The purpose of the action is to recover $500 as stipulated liquidated damages based on the defendant's breach of an automobile repurchase agreement. At the conclusion of defendant's evidence plaintiff moved for a directed verdict. This motion was sustained and judgment entered accordingly. Defendant, his motion for new trial having been overruled, appealed.

The instrument upon which this suit is based was executed by the appellant on October 4, 1947, at a time when he purchased from the appellee the automobile therein described. This instrument provides as follows:

"STANFORD MOTOR COMPANY

Broken Bow, Nebraska

Broken Bow, Nebr., October 4th 1947

FOR ONE DOLLAR and other valuable considerations, I hereby agree that I will not sell, barter, trade or assign Buick 4 Door Sedan Model 71 Serial No. 447 27 392 Motor No. 4908 330 7, to any person within six months from the above date, without first offering to resell it to the STANFORD MOTOR COMPANY, Broken Bow, Nebraska, at a price not exceeding the purchase price less a reasonable amount for usage. This constitutes a repurchase option, for the violation of which purchaser agrees to pay Stanford Motor Company the sum of five hundred dollars ($500.) as liquidated damages.

Witness: /S/ D. Halbersleben     /S/ E. J. Westman

Signature of Purchaser"

Appellant contends this agreement is void and unenforceable for the reason that it is an unlawful restraint of trade; is in violation of the laws of Nebraska, particularly sections 59-801, 59-802, and 59-805, R. S. 1943; thereof; is monopolistic in character; and contravenes sound public policy.

Section 59-805, R. S. 1943, provides, in part, as follows: "Every person, * * * or other association engaged in business within this state, * * * who shall sell

any article upon a condition, contract or understanding that it shall not be sold again by the purchaser, or restrain such sale by the purchaser, shall be deemed guilty of a misdemeanor, * * *."

There is no positive restriction in this instrument against reselling. The obligation in the agreement was to first offer the automobile to appellee on the terms as therein set forth if appellant elected to dispose of it within the six-month period therein provided. See Summers v. Adams Motor Co., — Ala. —, 39 So. 2d 300.

In Roberts v. Lemont, 73 Neb. 365, 102 N. W. 770, we said: "In determining the validity of a contract in restraint of trade, the test is whether the restraint is only such as is necessary to afford a fair protection to the interests of the party in whose favor it is given, and not so much as to interfere with the interest of the public."

In Swingle & Co. v. Reynolds, 140 Neb. 693, 1 N. W. 2d 307, we said: "Partial restraints upon the exercise of any business are not considered unreasonable when they are ancillary to any valid contract made in good faith and are apparently necessary to reasonably protect the parties, or either of them." See Wittenberg v. Mollyneaux, 60 Neb. 583, 83 N. W. 842.

The record discloses that shortly after the lifting of O.P.A. regulations the appellee adopted a business policy of selling all new cars received by it as agent of the Buick Motor Division of the General Motors Corporation to customers within the trade area of Broken Bow, where it is in business, at list price but required each purchaser to sign an agreement, such as appellant did here, to first offer to resell the car to appellee on the terms as in the repurchase agreement set forth in case such purchaser decided to dispose of the car at any time within six months from the date of purchase. Appellee thought, if the purchasers of its new cars immediately put them on the "gray market" where new used cars were at that time selling far above list price, it

would cause the buying public in the trade area of Broken Bow to feel, and possibly believe, that appellee was actually selling the new cars it received on the "gray market," thus damaging its business reputation in that community. Its purpose, in adopting this policy, was to prevent this from happening and thus protect its good will.

We find nothing in this policy that is contrary to the provisions of any statute that has been called to our attention. Neither do we think it is monopolistic in character, nor do we find it such an unreasonable restraint of trade that it can be said to contravene public policy. We think the restraint, considering the circumstances existing at that time, was reasonably necessary to fairly protect the business of the appellee and that it did not interfere so much with the interests of the public that it can be said to be against sound public policy. In fact, to the extent of the new cars being received by appellee and sold at list price, it protected the public from their being immediately offered for sale to it as new used cars in the "gray market" at a much higher price. We hold the repurchase agreement to be valid and enforceable.

Other states have very recently passed on the same question and have all come to the same conclusion. See, Schuler v. Dearing Chevrolet Co., 76 Ga. App. 570, 46 S. E. 2d 611; Burnett v. Nolen, 336 Ill. App. 376, 84 N. E. 2d 155; Summers v. Adams Motor Co., *supra;* Wade & Dunton v. Gordon, — Me. —, 64 A. 2d 422; and Bay Shore Motors v. Baker, — Cal. —, 202 P. 2d 865.

Appellant refers to the repurchase agreement as lacking mutuality and of its being unilateral in character. As stated in 12 Am. Jur., Contracts, § 13, p. 510: "If by mutuality of obligation is meant, as some courts have suggested, that there must be an undertaking on one side and a consideration on the other, the necessity for its existence cannot be questioned. But if, as other courts have said, mutuality of obligation means that a

contract must be binding on both parties, so that an action may be maintained by each against the other, the statement that mutuality of obligation is essential to every contract is too broad. Whatever the rule may be with respect to the specific enforcement of contracts, there can be no doubt that if a contract is ever unenforceable in other ways because of the lack of mutuality, it is because such lack of mutuality creates a want of consideration. Inasmuch as a promise by one person is merely one of the kinds of consideration that will support a promise by another, mutuality of obligation is not an essential element in every contract. Therefore, to say the least, language which is susceptible of the interpretation that consideration and mutuality of obligation are two distinct elements lacks precision. Consideration is essential; mutuality of obligation is not unless the want of mutuality would leave one party without a valid or available consideration for his promise. The doctrine of mutuality of obligation appears therefore to be merely another mode of stating the rule of consideration that where there is no other consideration for a contract, the mutual promises must be binding on both parties, for the reason that only a binding promise is sufficient consideration for a promise of the other party. But where there is any other consideration for the contract, so that each promise does not depend upon the other for consideration, mutuality of obligation is not essential."

"The doctrine of mutuality is inapplicable to unilateral contracts. If the promisor has received a sufficient consideration, his promise is binding and may be aptly termed an obligation, even though the consideration is not a promise and the promisee is not obligated. * * * Moreover, an option supported by consideration is valid even though the holder is not obligated to exercise it. The essence of an option contract is that it is not mutual, for the optionee pays his money or performs his promise for the right of electing whether or not he will re-

quire performance by the other party, and the optionor relinquishes his right of choice." 12 Am. Jur., Contracts, § 14, p. 512.

We said in Elson & Co. v. Beselin & Son, 116 Neb. 729, 218 N. W. 753: "Mutuality of obligation of both parties to a contract is not essential to effectuate a binding agreement where there is a separate valid consideration as an inducement to the agreement; * * *."

As stated in Schuler v. Dearing Chevrolet Co., *supra*: "A written agreement between two parties—based upon the consideration of the sale of a specific article of personal property and one dollar, receipt of which is acknowledged by the vendee from the vendor, wherein the vendee agrees that, should he decide to sell said property within six months from the date of the first sale, he will give the vendor the first opportunity to repurchase said property at the original purchase-price before offering the same for sale to others—is not void by reason of a lack of mutuality, and being unilateral, * * *."

The question therefore arises, was there consideration for the agreement here sought to be enforced? In this respect appellant contends the record presents a jury question for the reason that appellant, his wife, and their son all testified that the instrument here sought to be enforced, which will be herein referred to as the repurchase agreement, was never presented to appellant for execution nor was he aware that appellee would require that he sign such an agreement until after he had bought the Buick sedan and given his check, which he says appellee accepted, in payment thereof.

The record discloses that sometime prior to October 3, 1947, appellant had apparently notified appellee that he was desirous of buying a car. On the evening of October 3, 1947, appellee having received the Buick sedan referred to in the repurchase agreement, notified appellant by telephone that it had a car for sale if he was still interested in buying one. Appellant, his wife, and either one or two of their sons came to Broken Bow on the following

day at about 10:30 a. m. They went to appellee's place of business and there contacted Koozer, one of the members of the appellee partnership. Negotiations were then carried on for the purchase of the Buick sedan. Koozer offered the car for sale at the list price of $2,763, which included the accessories thereon of a radio, heater, seat covers, and sun visor, and offered to allow appellant the sum of $177 for his 1937 Chevrolet coupé, which appellee advised appellant it would require him to turn in on the deal. Koozer and appellee's bookkeeper, Halbersleben, testified that during these negotiations appellant was advised that if he bought the car he would be required to sign a repurchase agreement in accordance with the adopted business policy of the appellee in connection with its sale of new cars and was given a copy thereof. Appellant, his wife, and their son, all of whom were present during these negotiations, testified that no mention of this business policy and that appellant would be required to sign such a repurchase agreement was ever mentioned until after appellant had bought the Buick sedan and given a check in payment thereof, although the appellant's evidence indicates he knew, prior to giving his check, of both the policy and that he would be required to sign such an agreement. After lunch, the deal having been made, Koozer left for Omaha but before going turned the closing of the sale over to Halbersleben, appellee's bookkeeper. Halbersleben completed the deal later that same afternoon.

In closing the deal appellant turned over to appellee his 1937 Chevrolet coupé, gave his check in the sum of $2,586, and signed the repurchase agreement. Appellant then received possession of the Buick sedan and later the title thereto, the latter not being assigned to him until October 11, 1947, as appellee did not have the manufacturer's statement of origin at the time of the sale. Both parties executed a state invoice.

We think the evidence establishes, as a matter of law, that the sale and delivery of the Buick sedan constituted

one transaction and that all things done in consummation thereof were a part of the same transaction. While it was made up of several different parts, such as the transfer of title and delivery of the Chevrolet coupé, the transfer of title and delivery of the Buick sedan, the state invoice, the repurchase agreement, and the check, it all constituted part of the same transaction; that is, the sale of the Buick sedan. Being all part of the same transaction each part does not need a separate consideration but the consideration for the whole is consideration for each part which, insofar as the repurchase agreement is concerned, is the sale and delivery by appellee to appellant of the Buick sedan.

As stated in Bay Shore Motors v. Baker, *supra:* "We think that it is a part of the entire agreement of purchase and sale, and that the consideration for the sale is sufficient consideration for the option agreement." See Summers v. Adams Motor Co., *supra,* and Burnett v. Nolen, *supra.*

Although he did not get the title to the Buick sedan until October 11, 1947, appellant, on the evening of the same day he purchased the Buick sedan, sold it to Clyde West and delivered the car to him at that time. He did not give West a certificate of title thereto until October 15, 1947, after he had received his from the appellee. Neither prior to such sale and delivery nor at any time prior to transferring title thereof to West did appellant advise appellee of his intention to dispose of the Buick sedan nor did he give appellee an opportunity to purchase it in accordance with the repurchase agreement which he had signed. Appellant, by such conduct, breached the terms of the repurchase agreement.

Is the provision in this repurchase agreement as to liquidated damages in the nature of a penalty?

We said in Gustin & Co. v. Nebraska Building & Investment Co., 110 Neb. 241, 193 N. W. 269: "* * * where the damages are uncertain, and not readily capable of exact ascertainment by any known rule, and the parties sur-

veyed the whole situation at the time of contract, and agreed upon the amount of damages, in case of a breach in the contract to construct a building by a certain time, such sum, in case of a breach, is the true measure of recovery and is liquidated damages and not a penalty."

"In cases where the amount of damages incident to the breach of contract is uncertain, speculative and incapable of being definitely computed, a recovery may be allowed for the amount of the undertaking. 8 R. C. L. 569, sec. 118, 17 C. J. 941, sec. 237. See, also, Am. Ann. Cas. 1912C, 1026." Van Horn v. Ericson Lake Co., 113 Neb. 332, 203 N. W. 553.

"If the damages arising from a breach of the contract are difficult of ascertainment or admeasurement, and if the stipulated amount is not disproportionate to the amount of damages that may be reasonably anticipated from the breach, it will usually be regarded as a provision for liquidated damages. On the other hand, if the damages may be easily and readily ascertained, and if the amount stipulated is more than sufficient to compensate for the breach, it will be regarded as a penalty." Yant Construction Co. v. Village of Campbell, 123 Neb. 360, 243 N. W. 77.

As stated in Burnett v. Nolen, *supra:* "* * * this is precisely the type of case in which an agreement specifying liquidated damages is desirable, and entitled to enforcement in the courts, provided the amount is reasonable."

"As a general rule, the question of whether a sum mentioned in a contract is to be considered as liquidated damages or as a penalty is a question of law, dependent on the construction of the contract by the court." 25 C. J. S., Damages, § 102, p. 657.

"In such cases the court must find out whether the payment stipulated is in truth liquidated damages or a penalty. The question whether it is the one or the other is a question of law and one quite independent of the

agreement of the parties to call it the one or the other." 15 Am. Jur., Damages, § 246, p. 678.

Here the evidence shows that the market value of this car at the time of its sale to the appellant was far more than $500 above the list price at which it was sold to defendant; that the possible loss of servicing the car, if sold out of the trade area, was substantial but difficult of ascertainment; and that possible loss of future car business and good will, which latter is referred to as the "backbone of business," if new cars handled by appellee appeared for sale in the "gray market" were material but, as to the dollars and cents value thereof, difficult to ascertain and measure. The stipulated amount is not disproportionate to the amount of damages that might reasonably have been anticipated from a breach. We think the appellee has fully established facts showing a situation where it was proper to enter into an agreement for liquidated damages, consequently, evidence as to what appellant did or appellee would have done with the car is irrelevant and immaterial.

In view of the foregoing, the other questions raised become immaterial and will not be discussed. We find the action of the trial court to have been proper and it is therefore affirmed.

AFFIRMED.