SECURITIES ACCEPTANCE CORPORATION, A DELAWARE CORPORATION, ET AL., APPELLANTS, V. ROBERT M. BROWN, APPELLEE.

106 N. W. 2d 456

Filed December 9, 1960.    No. 34832.

*Matthews, Kelley & Stone* and *Baskins & Baskins,* for appellants.

*McGinley, Lane, Shanahan & McGinley,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

On August 26, 1959, Securities Acceptance Corporation, a Delaware corporation, brought this action in the district court for Lincoln County against Robert M. Brown, a former employee, for the purpose of enjoining him from breaching certain restrictive or non-competitive provisions of an employment contract which he had entered into with it. Subsequent thereto, and before trial, leave was granted to make Securities Acceptance Corporation of North Platte, a Nebraska corporation, a party plaintiff and that was done. On September 4, 1959, a hearing was held on plaintiffs' application for a temporary injunction and it was denied. Thereafter,

upon the issues raised and tried, the trial court found generally for the defendant and against the plaintiffs, held the restrictive provisions in the parties' employment contract to be void, and dismissed plaintiffs' petition. Plaintiffs thereupon filed a motion for new trial, which the trial court overruled. This appeal is from that order.

For convenience we shall herein refer to appellant Securities Acceptance Corporation, a Delaware corporation, as Securities Acceptance; to appellee Robert M. Brown as Brown; and to appellant Securities Acceptance Corporation of North Platte, Nebraska, a corporation, as Securities Acceptance Corporation of North Platte.

The action, which primarily seeks injunctive relief, is equitable in its character and, on review, will be considered de novo. See, Tarry v. Johnston, 114 Neb. 496, 208 N. W. 615; Personal Finance Co. v. Hynes, 130 Neb. 547, 265 N. W. 541; Adams v. Adams, 156 Neb. 778, 58 N. W. 2d 172; Gallagher v. Vogel, 157 Neb. 670, 61 N. W. 2d 245. In view of that fact we will reach an independent conclusion without referring to the findings of the district court.

Securities Acceptance is primarily engaged in the consumer loan and finance business although it also does some insurance business. Its home, or main office, is located in Omaha, Nebraska. It opened a branch office in North Platte, Nebraska, in 1947 and has continued to conduct such business there ever since. Some of the business in the North Platte office is done in the name of Securities Acceptance Corporation of North Platte, a wholly owned subsidiary of Securities Acceptance. However, Securities Acceptance directs all policies, conducts all activities, and hires and pays all employees in the North Platte office, including Brown while he worked therein.

Sometime prior to March 11, 1952, Securities Acceptance employed Brown to work in its North Platte office.

This contract of employment was entered into verbally. He began such employment as credit and collection manager on March 11, 1952, at a salary of $325 per month. Immediately prior thereto Brown had been working for Commercial Credit Corporation in Salina, Kansas. Commercial Credit Corporation is also engaged in the financing of loans and Brown had been working for it since December 1, 1949. On July 16, 1952, his salary was increased to $350 per month.

Sometime in August of 1952, Securities Acceptance sent Brown a written contract covering his future employment with it. This contract was in behalf of Securities Acceptance and its subsidiaries. Brown voluntarily signed this agreement and returned it to the Omaha office of Securities Acceptance. It was also executed by Securities Acceptance. It is dated August 28, 1952, and provides, insofar as here material, that:

"V. The Employee, unless especially instructed by the Employer to disclose the facts, in which event he will comply strictly with said instructions, will keep secret from every person the names of past, present and prospective borrowers, security holders, and all other business customers and associates of the Employer, together with all knowledge which he may at any time acquire during his employment as to such subjects and as to any loans, earnings, finances, and all other concerns of the Employer.

"VI. The employee will not furnish to any other person or retain or use any papers or information whatever concerning any of the subjects and matters referred to in paragraph V.

"VII. All the terms of paragraphs V and VI shall remain in full force and effect for three years after the termination of the employment provided for in this contract; and, during the whole of said period, the Employee will not make or permit to be made any public announcement that he was formerly connected with the Employer.

"VIII. For a period of eighteen months after the termination of his employment for any reason, provided such termination shall take place not less than six months after the date hereof, the Employee will not engage in any way directly or indirectly in any business competitive with the Employer's business, nor solicit or in any other way or manner work for or assist any competitive business in any city or the environs or trade territory thereof in which the Employee shall have been located or employed by the Employer."

After Brown signed this written contract of employment with Securities Acceptance, dated August 28, 1952, he continued on as credit and collection manager in its branch office at North Platte. Effective as of October 1, 1953, his salary was increased to $375 per month, and, as of July 15, 1954, to $390 per month. Thereafter, effective as of April 1, 1955, he was promoted to branch manager of the North Platte office. While his salary was reduced to $350 per month upon becoming branch manager he was thereafter, as a part of his pay, given a bonus, which was dependent upon profits. For the balance of that year his bonus was $947.96. He continued as branch manager of the North Platte office until June 1, 1959. During the interim his salary was raised on January 1, 1956, to $400 per month; on August 1, 1956, to $425 per month; on January 1, 1957, to $460 per month; on January 1, 1958, to $475 per month; and on January 1, 1959, to $500 per month. During this same period of time the bonus arrangement, based upon profits of the office, continued. In 1956 his bonus was $2,044.56; in 1957 it was $1,671.33; in 1958 it was $1,519.52; and up to June 1, 1959, it was $590.02. As branch manager of the North Platte office Brown had full control and was in complete charge of all operations therein. He operated it under Securities Acceptance policies and procedures and became fully acquainted therewith, as well as with the customers doing business with Securities Acceptance and its subsidiaries in and through that office.

Effective as of June 1, 1959, Brown was promoted to the position of a supervisor at a flat salary of $675 per month. This position required him to work out of the home office in Omaha. For this purpose he came to Omaha but did not bring his family with him, leaving them in North Platte. His family then consisted of himself, his wife, and three small children. During the time he continued in the employ of Securities Acceptance as a supervisor, which was up to July 15, 1959, he was not assigned any regular territory over which he was to act as a supervisor for he had to go through a training period to acquaint himself with the work of the position. This training consisted of going with one of the regular supervisors and learning the duties of a supervisor from him. It should here be mentioned that Securities Acceptance had some 89 branch offices in some 15 states to which 6 supervisors were assigned, each having supervision of a certain number of these branch offices for which they were responsible. During this period Brown spent a week in connection with the branch office at Norfolk, Nebraska, a week in connection with the branch office in Winner, South Dakota, and 2 weeks in connection with 1 of the 4 branch offices in Omaha. The balance of the time he spent in the home office. On July 13 and 14, 1959, Brown talked with certain officers of Securities Acceptance and told them he was going to quit as of July 15, 1959, and did so. He gave as a reason for doing so that the driving he would have to do in connection with his work as a supervisor would be more than his back could stand. However, he also told them he was going to work for the North Platte Loan and Finance Company in its office in North Platte, stating he had an opportunity to invest up to $35,000 therein, and asked if Securities Acceptance expected to enforce the restrictive provisions of his employment contract with it if he did so.

While operating out of the home office of Securities Acceptance during the 6-weeks' period Brown drove to

North Platte to be with his family on four or five different weekends. During the latter part of June, or forepart of July, Brown, while in North Platte over a weekend, called Mr. George Larkin of the North Platte Loan and Finance Company on his own volition. The purpose for calling Mr. Larkin was to discuss with him the possibility of being employed by the North Platte Loan and Finance Company in its North Platte office. It should here be stated that North Platte Loan and Finance Company is engaged in consumers loan and finance business and in insurance business in North Platte in competition with Securities Acceptance. As a result of Brown's call he had two visits with Larkin on two different weekends. One of these took place in Brown's home, the other in Larkin's. Not only was salary discussed at these meetings, but also the question of Brown buying into the company. Thereafter, on July 17, 1959, after Brown had quit his employment with Securities Acceptance, Brown and Larkin had a further discussion in North Platte which resulted in Brown being employed by North Platte Loan and Finance Company to work in its North Platte office at a salary of $600 per month. Brown commenced to work on this job on August 3, 1959, and has been so employed ever since. Since taking this employment Brown admits he has made changes in the manner of operating North Platte Loan and Finance Company, which changes, he admits, were based on knowledge he had gained while an employee of Securities Acceptance. He also admits he has called on and talked to former customers of Securities Acceptance but denies having solicited them for any business.

Cases of other jurisdictions dealing with the subject of this litigation are very numerous and, upon what appear to be similar situations, come to varying conclusions and results. This court has also dealt with the subject thereof on several occasions. Insofar as it has done so we see no good reason for now departing from

the principles therein announced except to say that each case must necessarily stand or fall on its own facts.

At common law all contracts in restraint of trade were against public policy and void. Kadis v. Britt, 224 N. C. 154, 29 S. E. 2d 543, 152 A. L. R. 405. However, while not favorites of the law, partial restraints are not deemed to be unenforcible when they are ancillary to a contract of employment and are apparently necessary to afford fair protection to the employer. Roberts v. Lemont, 73 Neb. 365, 102 N. W. 770; Dow v. Gotch, 113 Neb. 60, 201 N. W. 655; Personal Finance Co. v. Hynes, *supra*. The same would be true of a partial restraint of business competition in connection with a sale or purchase thereof. Downing v. Lewis, 56 Neb. 386, 76 N. W. 900; Wittenberg v. Mollyneaux, 60 Neb. 583, 83 N. W. 842; Swingle & Co. v. Reynolds, 140 Neb. 693, 1 N. W. 2d 307; Stanford Motor Co. v. Westman, 151 Neb. 850, 39 N. W. 2d 841; Adams v. Adams, *supra:* Gallagher v. Vogel, *supra*. As stated in Adams v. Adams, *supra:* "A contract which imposes partial restraint upon the exercise of a trade, business, or occupation is not unreasonable when it is ancillary to an actual transaction involving property, business, or employment made in good faith and is necessary or appropriate to afford fair protection to the one in whose favor the restriction is made. Such a contract will be respected and enforced." The restrictive provisions here sought to be enforced are ancillary to the contract of employment between Securities Acceptance and Brown.

In Adams v. Adams, *supra,* we said: "* * * the law does not look with favor upon restrictions against competition, and an agreement which limits the right of a person to engage in a business or occupation will be strictly construed and will not be extended by implication or construction beyond the fair or natural import of the language used." However, in Gallagher v. Vogel, *supra,* we went on to say: "Contracts (such as here involved) must receive a reasonable construction,

so as to give effect to the intention of the parties thereto and carry out, rather than defeat, the purpose for which they were executed." See, also, Tarry v. Johnston, *supra*.

Brown contends the written contract of employment dated August 28, 1952, is not enforcible because there was no new consideration involved when it was executed. The original oral agreement of employment between the parties was one at will, that is, either party could terminate it at any time. The written agreement provides, in this respect, "* * * that either party may terminate the employment * * * by fifteen days' notice to the other, and if the Employer shall so terminate it, the Employee shall be entitled to pay for said fifteen days, * * *." Thus additional benefits accrued to Brown by the terms of the written agreement which did not contractually exist prior thereto.

But Brown testified he understood, at the time he went into the office of Securities Acceptance at North Platte on March 11, 1952, that it had a policy, whenever it discharged an employee for any cause, of giving such employee 2-weeks' pay. Let us assume, but not decide, that by reason of such policy, if it existed, that the foregoing provision in the written agreement did not provide any additional benefits for Brown. After Brown voluntarily signed the agreement with Securities Acceptance he continued his employment with it for almost 7 years. During this time he was promoted to branch manager of the North Platte office and thereafter, as of June 1, 1959, to the position of supervisor. During the same period of time his salary was, at various times, increased, raising it from $350 up to $675 per month. During the period from April 1, 1955, to June 1, 1959, Brown received bonuses, based on profits, totaling $6,773.39. Then, on July 13, 1959, without good cause, he notified his employer he was quitting as of July 15, 1959, probably to take employment with another company in North Platte engaged in a similar business,

thus clearly breaching his contract of employment. Under similar or comparable situations other courts have enforced the restrictive provisions of an agreement in partial restraint of trade. See, Roessler v. Burwell, 119 Conn. 289, 176 A. 126; Ofsowitz v. Askin Stores (Tex. Civ. App.), 306 S. W. 2d 923; Krueger, Hutchinson & Overton Clinic v. Lewis (Tex. Civ. App.), 266 S. W. 2d 885, affirmed 153 Tex. 363, 269 S. W. 2d 798; McAnally v. Person (Tex. Civ. App.), 57 S. W. 2d 945. Having received the benefits accruing to him from his execution of the contract for almost 7 years, Brown is not now in a position, after his breach thereof, to ask a court of equity to find such agreement void because of want of consideration.

We also think Brown is estopped from doing so by the following principle, as stated in Brisbin v. E. L. Oliver Lodge No. 335, 134 Neb. 517, 279 N. W. 277: " 'The doctrine of equitable estoppel is frequently applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced or of which he has accepted any benefit. * * * And so also the acceptance of any benefit from a transaction or contract, with knowledge or notice of the facts and rights, will create an estoppel.' "

As we have already said, each case must, of necessity, depend upon its own facts and circumstances. In Smith Baking Co. v. Behrens, 125 Neb. 718, 251 N. W. 826, it was said: "Injunction should not be granted to enforce a negative agreement in a contract of employment, unless the court is satisfied that the enforcement will be just and equitable and will not work undue hardship or oppression." See, also, Mollyneaux v. Wittenberg, 39 Neb. 547, 58 N. W. 205; Downing v. Lewis, *supra;* Wittenberg v. Mollyneaux, *supra;* Roberts v. Lemont, *supra;* Dow v. Gotch, *supra;* Stanford Motor Co. v. Westman, *supra.* In Swingle & Co. v. Reynolds, *supra,* we held that: "A contract of employment may

constitute a valid consideration for an agreement that the employee will not compete with his employer during the term of the employment, or thereafter, within such territory and during such time as may be reasonably necessary for the protection of the employer's business."

There are three general requirements relating to partial restraints of trade: First, is the restriction reasonable in the sense that it is not injurious to the public; second, is the restriction reasonable in the sense that it is no greater than is reasonably necessary to protect the employer in some legitimate interest; and, third, is the restriction reasonable in the sense that it is not unduly harsh and oppressive on the employee. See, Roberts v. Lemont, *supra;* Dow v. Gotch, *supra;* Personal Finance Co. v. Hynes, *supra;* Annotation 43 A. L. R. 2d, Employee-Restrictive Covenant-Area, § 19, p. 144.

As to the first two of the foregoing we have already decided, in Personal Finance Co. v. Hynes, *supra,* that a restriction on employment is not injurious to the public as it relates to a small loan business; that if properly limited as to time and space, it is no greater than is reasonably necessary to protect an employer engaged in such business; that an employee, within such time, is capable of doing irreparable damage; and that, under such circumstances, the remedy available at law is not adequate, thus giving rise to injunctive relief. But Brown contends our holdings in this regard in Personal Finance Co. v. Hynes, *supra,* are merely dicta since the case was actually disposed of on the basis of waiver. However, a careful consideration of the situation therein involved makes the following applicable to our holdings therein: "The determination of a matter which is involved in the litigation and discussed at the bar is not to be regarded as mere dictum, even though it is only indirectly involved in the decision of the question upon which the case turns." Lancaster County v. McDonald, 73 Neb. 453, 103 N. W. 78. Discussion of what is dictum

may be found in Sedlacek v. Welpton Lumber Co., 111 Neb. 677, 197 N. W. 618. Therein we quoted with approval the following from Union P. R. R. Co. v. Mason City & Ft. D. R. R. Co., 199 U. S. 160, 26 S. Ct. 19, 50 L. Ed. 134: " 'Whenever a question fairly arises in the course of a trial, and there is a distinct decision of that question, the ruling of the court in respect thereto can, in no sense, be called mere dictum. * * * It cannot be said that a case is not authority on one point, because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter.' "

Satisfactory proof is required of the one seeking injunctive relief to establish the necessity for and the reasonableness of covenants restraining the inherent right to labor in cases when the restraint deals with the performance of personal services. Roberts v. Lemont, *supra.*

The evidence shows that Brown, as branch manager of the North Platte office of Securities Acceptance for many years, became familiar with its policies, its procedures, its customers, and all the factors involving the operation thereof and, upon assuming his employment with the North Platte Loan and Finance Company, could use such knowledge for the benefit of that company. As stated in 9 A. L. R. in Part III, § b(1), p. 1468, under the Annotation of Restrictive Covenant in Employment Contract: "It is clear that if the nature of the employment is such as will bring the employee in personal contact with the patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers, enabling him, by engaging in a competing business in his own behalf, or for another, to take advantage of such knowledge of or acquaintance with the patrons or customers of his former employer, and thereby gain an unfair ad-

vantage, equity will interfere in behalf of the employer and restrain the breach of a negative covenant not to engage in such competing business, either for himself or for another, providing the covenant does not offend against the rule that as to the time during which the restraint is imposed, or as to the territory it embraces, it shall be no greater than is reasonably necessary to secure the protection of the business or good will of the employer." We think the foregoing has application to the situation here presented. See, also, Masden v. Travelers' Ins. Co., 52 F. 2d 75, 79 A. L. R. 469; Matthews v. Barnes, 155 Tenn. 110, 293 S. W. 993, 52 A. L. R. 1350; Briggs v. Butler, 140 Ohio St. 499, 45 N. E. 2d 757.

Brown contends the enforcement would be unduly harsh and oppressive upon him because of his physical condition and economic status. As to the first, the evidence shows that Brown, in connection with his services in the armed forces of his country, suffered a service-connected disability in the form of rheumatoid arthritis as a result of swimming in cold water in connection with his duties in under-water demolition. This condition was first classified by the Veterans Administration as 20 percent disabling but later, as of October 13, 1953, rated as 40 percent disability. Brown advised the officers of Securities Acceptance of his condition but never to the effect that it bothered him in any manner in performing his duties for it. During the time he was at North Platte, especially while branch manager, his duties required him to drive his car over the territory being served from that office. He drove it from 2,500 to 3,000 miles a month. He never complained that doing so bothered him and apparently it didn't. When he was transferred to Omaha and became a supervisor he knew that position involved traveling extensively in a car but he made no complaint of that fact when he accepted the position. In fact, during the short time he was in Omaha he drove to North Platte on either four or

five weekends. He also, at all times, did extensive driving for his and his family's pleasure. We do not think the evidence establishes that driving a car very seriously affected Brown's back. In fact, we think he used that as an excuse for breaching his contract at a time when he had already laid the ground work for employment with North Platte Loan and Finance Company. The latter was the real reason why he quit.

Brown was born on June 27, 1925. He was graduated from the Business Administration College of Kansas State University in 1949 with a B. S. degree, having majored in economics and mathematics. After graduation he sold life insurance for a short while but, as of December 1, 1949, took employment with Commercial Credit Corporation at Salina, Kansas. He was married on December 30, 1950. When, as of February 22, 1952, Brown made application for employment with Securities Acceptance, his financial situation seemed to be reasonably good for a man of his age. The extent of his income while working for Securities Acceptance has already been set forth. It shows he has ability in the field which he has chosen for his life's work. Employment in this field is available in any city of any size. Brown has been and is now apparently being paid disability benefit payments on the basis of his service-connected disability in his rank of lieutenant (j.g.) which he had at the time of his honorable discharge from the Navy. When Brown resigned he took a cut in salary. He then told the officers of Securities Acceptance that doing so was not of too much concern in view of both his and his wife's families' financial condition. In fact he told them that by going with North Platte Loan and Finance Company he had a chance to invest up to $35,000 therein. Considering all of these factors we do not think the restriction imposed, as such, was unduly harsh and oppressive. As we said in Dow v. Gotch, *supra:* "Times have changed since the day when an English court, upon being advised that a contract of

this nature had been entered into, declared that if he had the employer present he would impose a fine upon him to be paid to the king. In that early day men did not go from place to place as they do now. The habit of covering a wide territory had not become prevalent. A journeyman stayed where he had been raised and where he had learned his trade. A removal to a place 50 miles or more away was a great undertaking. People did not go away from home, they stayed where they were put. The situation is different here and today. A removal to another state is easy and comparatively inexpensive. Men and women of all employments go from one end of the country to another, and quickly find new places, and more advantageous places, in which to practice their vocations. With the development of railroad service and the automobile (and we might add air travel), people do not remain rooted to their native soil. Without danger to themselves and without detriment to the public, men and women may, and do, contract not to engage in particular work in a particular place. Modern living has extended the range of the individual." In this respect we have not overlooked Brown's service-connected disability but that does not appear to seriously affect his ability to work at his chosen vocation, plus the fact that he receives disability benefit payments by reason thereof. Nor have we overlooked the fact that Brown now has a family. That is only normal for a man of his age. His life's work is of such a nature that it can be carried on in almost any city and is not peculiarly adapted only to North Platte, except as he has an advantage in working there because of the knowledge he has gained and friends he has made while working for Securities Acceptance. We think what was said in Household Finance Co. v. Sutton, 130 W. Va. 277, 43 S. E. 2d 144, has application here: "As to a possible hardship upon the employee, it is to be remembered that in this instance the employee voluntarily terminated his own

employment or resigned. There is no imputation of bad faith on the part of the employer in that respect. If there were our holding on that phase of the matter could well be different. But in the case at bar we see no hardship brought upon the defendant Sutton unless it is that which resulted from his own lack of bona fides."

In connection with the question of whether or not the restriction is reasonable in the sense that it is no greater than is necessary to protect the employer in some legitimate interest and reasonable in the sense that it was not unduly harsh and oppressive on the employee the question of time and space is involved. A contract in restraint of trade, which is neither limited in time nor space, is against public policy and void. See Roberts v. Lemont, *supra.* As stated therein: "A contract in restraint of trade which is not limited either in time or space is against public policy and void." Where the conditions therein appear to be reasonable in their terms and operation, contracts containing restrictive provisions may be enforced, although they are limited as to either time or space. See, Roberts v. Lemont, *supra;* Farmers State Bank v. Petersburg State Bank, 108 Neb. 54, 187 N. W. 117; Dow v. Gotch, *supra.* However, the general rule is that a contract in partial restraint of trade must be reasonable in its terms and limited in its extent, that is, limited as to both time and space. See, Mollyneaux v. Wittenberg, *supra;* Downing v. Lewis, 59 Neb. 38, 80 N. W. 261; Roberts v. Lemont, *supra;* Engles v. Morgenstern, 85 Neb. 51, 122 N. W. 688; Buerstatte v. Swanson, 112 Neb. 30, 198 N. W. 174; Dow v. Gotch, *supra;* Swingle & Co. v. Reynolds, *supra.* As stated in Roberts v. Lemont, *supra:* "The general rule is that a contract in partial restraint of trade should be reasonable in its terms and limited in its extent, both as to time and space, * * *." We think the latter is applicable here.

With respect to the contract provision as to space

it provides the restriction shall apply "in any city or the environs or trade territory thereof in which the Employee shall have been located or employed by the Employer." The provision definitely limits the area to cities in which an employee has been located or employed or to the environs or trade territory thereof. That Brown fully understood that "trade territory," as contained in the contract, applied to the geographical area assigned to a branch office by Securities Acceptance is fully established by the record. That fact was fully evidenced when the "trade territory" serviced out of North Platte was decreased when a branch office was established at McCook. Brown is not now in a position to dispute that fact. We have held that such a limitation of area is an enforcible provision. Personal Finance Co. v. Hynes, *supra.*

There is a further factor involved in the area limitation provision. It is disjunctive in form. It permits restraint in any city in which the employee has been located or employed by his employer; to any such city and its environs; or to any such city, its environs and trade territory. The latter within the area as the use of "trade territory" in the agreement was understood by the parties. See, Whiting Milk Companies v. O'Connell, 277 Mass. 570, 179 N. E. 169; McAnally v. Person, *supra;* Household Finance Corp. v. Sutton, *supra.* As stated in Whiting Milk Companies v. O'Connell, *supra:* "A contract in restraint of trade in which the territory is unreasonably extensive may be divisible as to space and enforced in equity within a reasonable area."

We come then to the question of the limitation as to time. It is for a period of 18 months after the termination of Brown's employment with Securities Acceptance for any reason in any city in which he may have been located or employed and not 18 months from the last date he was located or employed in such city by the employer. And such is the manner in which Securities Acceptance construed it for it sought to enjoin

Brown for 18 months from July 15, 1959, the date he severed his employment with it, and not from May 31, 1959, the latter being the last day he was located at and employed in the office at North Platte. In other words, if Brown had been last located or employed in the office at North Platte some 20 years prior to leaving his employment with Securities Acceptance, the provision would still be effective to restrain him from seeking employment in North Platte in the field in which Securities Acceptance is engaged for 18 months thereafter. We do not think such provision is necessary to protect Securities Acceptance insofar as it is operating a loan business in North Platte, or any other city. We find it is unduly harsh and oppressive on Brown or any other of its employees coming within the provisions of similar agreements.

Having come to the conclusion that paragraph VIII of the parties' agreement is unreasonable insofar as it provides an unreasonable length of time during which an employee may be prevented from taking up his vocation in any city where he has been located or employed while in the employment of Securities Acceptance, we turn to the other restrictive provisions hereinbefore set forth.

Paragraphs V and VI thereof, insofar as they relate to Brown while he was in the service of Securities Acceptance, are reasonable and proper but with that viewpoint we are not here involved. Paragraph VII provides that they shall remain in full force and effect for 3 years after the termination of the employment, together with the restrictions contained in paragraph VII itself. We think paragraph VII is unenforcible because there is no limitation on area. Certainly it is not necessary, in order to reasonably protect Securities Acceptance's legitimate interests, to prevent a former employee covered thereby from doing all the things therein prohibited in all cities of the United States, and their trade territories, in which Securities Acceptance

has not been or is not now operating. But assuming such provisions are enforcible, we think there is a good reason why they should not be enforced in this action in view of the record before us. Within the intent and meaning of the contract, we do not think paragraphs V, VI, and VII applied to Brown after he obtained employment with North Platte Loan and Finance Company on August 3, 1959, for paragraph VIII relates to the limitations placed on such employee after he obtains, either directly or indirectly, reemployment in the same field. However, insofar as the restrictions contained in paragraphs V, VI, and VII, relate to paragraph VIII, they are controlled by our holding in regard thereto.

We have come to the conclusion that Securities Acceptance is not entitled to the injunctive relief herein sought and for that reason we affirm the action taken by the trial court.

AFFIRMED.

SIMMONS, C. J., participating on briefs.