AMERICAN SECURITY SERVICES, INC., A NEBRASKA CORPORATION, APPELLANT, V. ROBERT W. VODRA, APPELLEE.

385 N.W.2d 73

Filed April 11, 1986.   No. 84-748.

William E. Naviaux and H. Jerome Kinney, and J. Patrick Green, for appellant.

James P. Fitzgerald of McGrath, North, O'Malley & Kratz, P.C., for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

American Security Services, Inc., appeals the judgment of the district court for Douglas County denying American's requested injunction and accounting as a result of Robert W. Vodra's breach of a restrictive covenant in conjunction with Vodra's employment with American. We reverse and remand for further proceedings.

On appeal to this court an equitable action seeking an injunction to enforce a postemployment covenant not to compete is a trial of factual questions de novo on the record, requiring this court to reach a conclusion independent of the findings of the trial court. See, Neb. Rev. Stat. § 25-1925 (Reissue 1979); *National Farmers Union Serv. Corp. v. Edwards*, 220 Neb. 231, 369 N.W.2d 76 (1985). Our de novo review of the record is subject to the rule that, where credible evidence is in conflict on material issues of fact, the Supreme Court will consider the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Estate of Lienemann, ante* p. 169, 382 N.W.2d 595 (1986).

Before graduation from college Vodra had only part-time employment, no special vocational training, and no experience in the field of security services for businesses, as well as no background in sales or marketing. In 1977 Vodra, age 27, was graduated from the University of Nebraska-Omaha with a degree in criminal justice and minors in political science and economics. In November 1977 Vodra entered employment with American, which provided security service and guards for various types of businesses. In conjunction with employment

contracts American required all employees to sign a noncompetition agreement in a printed form:

> During the time of your employment with American Security Services and for three (3) years thereafter you shall not, in the contract guard field, directly or indirectly solicit business from, contract with or take employment with any customer or former customer of the American Security Services or any other guard company or individual where you have (a) worked physically upon said customers premise (b) acted in a supervisory capacity with respect to said premises (c) acted as a salesman for the American Security Services in soliciting said customers business.

After signing that restrictive covenant Vodra received a monthly salary of $800 for his position as shift supervisor in Omaha, responsible for visiting American's customers and seeing that guards "were doing their jobs." In 1978 Vodra was promoted to operations manager in charge of supervisors and responsible for "hiring and firing . . . guard personnel." Vodra became regional manager in 1980, received a monthly salary of $1,500, moved to American's Lincoln office to "enlist new clients" and "ensure that the clients we did have were being serviced adequately."

While Vodra was regional manager at Lincoln, American's vice president and general manager in Lincoln, Nicholas J. Sloan, and Vodra obtained a contract on July 7, 1981, between American and the Nebraska State Board of Agriculture for security services at the State Fairgrounds, which included the split season for horseraces. With the state contract as background, Sloan made the initial contact with the Hall County Livestock Improvement Association, "Fonner Park," in Grand Island, regarding security services for the 1982 racing season. American, pursuant to its contract signed by Vodra as regional manager, supplied Fonner Park with security personnel for the 1982 racing season. During that season, Vodra visited Fonner Park at least "once a week," kept in contact with the racetrack's management, handled any major complaints from Fonner Park, hired security personnel for that track, and, generally, assured that the "client was still happy." American

also supplied security service at the State Fairgrounds during the 1982 racing season. American's business involving the two racetracks was conducted through its Lincoln office where Vodra was stationed.

In the summer, 1982, Sloan left American and went to work for a security service in Texas. Vodra became American's director of marketing and was responsible for developing a marketing plan and calling on potential customers. Vodra's territory was bounded by Des Moines on the east, the state lines on the north and south, and Lexington on the west. Vodra contacted Atokad racetrack in South Sioux City, as well as other businesses located within his territory. During a telephone call to Texas, Vodra asked Sloan what "[Sloan] thought of the idea of [Vodra's] going into the race track security business." When Sloan responded that the noncompetition agreement was a problem, Vodra stated his attorney had examined the restrictive covenant and indicated that Vodra did not "have to pay very much thought" to such agreement.

On January 12, 1983, through a contract signed by Vodra on behalf of American, Fonner Park again obtained security services for the 1983 season. American supplied personnel at $5.34 per hour for each guard required by Fonner Park and was responsible for "money transfer . . . from the track to the bank." In May 1983, shortly after the racing season, the general manager of Fonner Park contacted Vodra and inquired whether in 1984 American would provide the same security services at the same rate as had existed under the 1983 contract. Fonner Park did not contact any others concerning security services for the 1984 season. As directed by American's officers, on May 3 Vodra wrote a letter to Fonner Park's general manager, stating that the basic and essential terms of the 1983 contract would apply to any contract for the 1984 season. There was no response from Fonner Park at that time. American again provided security personnel for the racing season at the State Fairgrounds in 1983.

In December 1983 Sloan returned to Nebraska employment with American as its vice president of marketing and development. American demoted Vodra to a position as Sloan's subordinate. In the course of a conversation, Sloan asked

Vodra: "[W]hat is the status on the Grand Island races?" Vodra answered that he "hadn't totally given up the idea" of forming a security business to provide for Fonner Park because he had his "connection with Grand Island race people" and "knew the powers that be."

Although he had indicated he might leave employment with American, after taking a brief vacation, Vodra, on January 24, 1984, told Jack Owens, American's general manager, that he would remain with American.

During his vacation, Vodra visited in Grand Island with Fonner Park's general manager concerning some additional specifications for security services to be rendered by American during the 1984 racing season. When Vodra returned from his vacation, Sloan inquired about the status of the "Grand Island contract," and Vodra stated that "it was taken care of." However, Vodra later acknowledged he had "probably not" used his best efforts to obtain the 1984 Fonner Park contract for American.

On January 31 Vodra informed Owens: "I'm terminating my employment." Vodra telephoned the general manager for Fonner Park on February 2 and said he was no longer associated with American but would like to discuss security services for Fonner Park's 1984 season. Because the racing season at Grand Island would commence in approximately 3 weeks, the general manager invited Vodra to submit a proposal for security services at the racetrack. On February 3 Fonner Park's general manager visited with Sloan and Owens about security services from American for the 1984 season. In the office of the Nebraska Secretary of State on February 6, Vodra filed articles of incorporation for his corporation, Pegasus Security Corporation, organized to supply security services and services as a private detective agency. American submitted its proposal to Fonner Park on February 7 with the same terms as had existed in the 1983 contract with Fonner and which had been stated in American's still unanswered letter of May 3, 1983, sent to Fonner Park. On February 9 Vodra negotiated and obtained a contract between Pegasus and Fonner Park for the 1984 season. The rate "per man hour" under the Pegasus contract was 4 cents per hour less than the rate submitted to

Fonner Park in American's proposal of February 7.

Regarding selection of Pegasus rather than American, the general manager for Fonner Park explained that Pegasus had guaranteed its rate through the 1985 racing season, that "Vodra was familiar with our, the past services of handling the Fonner Park account," and that "[our] race track security is a little bit more sophisticated than just passing it around as far as the handling of the account." As the result of enlarged operations and construction at Fonner Park, payments to Pegasus were approximately $5,000 per week for the 10-week racing season in 1984.

At the time of trial Vodra was 33 years old, unmarried, resided in Omaha, and was in good health. Vodra had no dependents and was born and raised in Omaha.

American filed suit against Vodra, seeking an injunction and an accounting. American based its claim on the restrictive covenant signed by Vodra. In his answer Vodra alleged the postemployment covenant not to compete was void because the restrictive covenant was unduly harsh, was more restrictive than reasonably necessary to protect American's interests, and was unreasonable in time and space. Owens testified that the "three stipulations," or situations activating the covenant, were an employee's "work physically upon said customer's premises; act in a supervisory capacity with respect to said premises, and act as a salesman for American Security in soliciting said customer's business." The district court, finding the restrictive covenant to be "unreasonable and unenforceable," dismissed American's action. American contends the postemployment restrictive covenant is reasonable and will not inflict hardship on Vodra. Also, American claims the district court was erroneous in its denial of an accounting under the circumstances.

What is the catalyst for the covenant not to compete? The covenant's language contains no conjunctive word designating the relationship of the three situations or conditions activating the covenant. With insertion of the conjunction *or* into the covenant in reference to the three situations, the covenant is activated when any of the three conditions exists. However, if the conjunction *and* is used, the covenant requires existence of

the three conditions in combination before the covenant is activated. Thus, the covenant is reasonably susceptible to more than one interpretation and, consequently, is ambiguous. "When contractual language is ambiguous, a court will construe such language against the party preparing the contract, especially where the language is embodied in a preprinted form." *Craig v. Hastings State Bank*, 221 Neb. 746, 750, 380 N.W.2d 618, 621 (1986). Construing the provisions of the covenant not to compete, we conclude that there must be combined existence of all three conditions or situations before the covenant is activated. The undisputed facts establish existence of each condition in the present case.

As stated in *Securities Acceptance Corp. v. Brown*, 171 Neb. 406, 417, 106 N.W.2d 456, 463 (1960), there are three general requirements for a valid, partial restraint of trade such as a postemployment covenant not to compete, namely:

> First, is the restriction reasonable in the sense that it is not injurious to the public; second, is the restriction reasonable in the sense that it is no greater than is reasonably necessary to protect the employer in some legitimate interest; and, third, is the restriction reasonable in the sense that it is not unduly harsh and oppressive on the employee.

The first inquiry is whether the restraint imposed by the restrictive covenant is reasonable "in the sense that it is not injurious to the public." *Id.* The record does not demonstrate that enforcement of the covenant not to compete will be detrimental to the public. Therefore, we shift our focus to another aspect of reasonableness; that is, the restrictions in space and time must be "no greater than is reasonably necessary to protect the employer in some legitimate interest." *Id.*

In *Boisen v. Petersen Flying Serv., ante* p. 239, 383 N.W.2d 29 (1986), we stated an employer has a legitimate business interest in protection against a former employee's competition by improper and unfair means, but is not entitled to protection against ordinary competition from a former employee. Distinguishing the two types of competition, we stated:

> To distinguish between "ordinary competition" and "unfair competition," courts and commentators have

frequently focused on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers. Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair, and the employer has a legitimate need for protection against the employee's competition.

*Id.* at 245-46, 383 N.W.2d at 33.

Thus, a key for distinguishing "unfair competition" from "ordinary competition" is an employee's appropriation of "good will" properly belonging to the employer.

In reference to an employer-customer relationship, good will is that

value which results from the probability that old customers will continue to trade or deal with the members of an established concern. [Good will] is the probability that old customers will resort to the old place or seek old friends, and the likelihood of new customers being attracted to well advertised and favorably known services
. . . .

*Jackson v. Caldwell*, 18 Utah 2d 81, 85, 415 P.2d 667, 670 (1966).

Good will may also be characterized as "the habit of customers to return to the concern with which they have been previously dealing. The more ingrained the habit, the greater the number of such customers, the more valuable is the goodwill." *Meeker v. Stuart*, 188 F. Supp. 272, 275 (D.D.C. 1960).

Some commentators have recognized the unique opportunity of a salesperson to appropriate customer good will of an employer and use that good will to the employer's disadvantage in subsequent transaction; for example, where a former employer's customer transacts with the former employee in that employee's individual or representative capacity.

The employer's sole or major contact with buyers is

> through these agents and the success or failure of the firm depends in part on their effectiveness. . . . [T]he possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available. Thus, some customers may be persuaded, or even be very willing, to abandon the employer should the employee move to a competing organization or leave to set up a business of his own.

Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 654 (1960).

An employer may view customers or clientele as "an asset of value which has been acquired by virtue of effort and expenditures over a period of time," and, according to Blake, "under traditional agency concepts, any new business or improvement in customer relations attributable to [an employee] during his employment is for the sole benefit of the principal." *Id.* Corbin makes the following observation about salespersons:

> Salesmen and solicitors are generally hired and paid a salary in order that they may help to build up custom, getting acquainted with customers and acquiring their good will. A promise to forbear to solicit such customers and to deprive the employer of the advantage of that good will is reasonable.

6A A. Corbin, Corbin on Contracts § 1394 at 98 (1962).

Clientele or customer contact is one of the most important assets, sometimes the stock, of a business. Protection of customer good will against appropriation by an employee is, generally, recognized as an employer's valid interest. See, *Borden, Inc. v. Huey*, 261 Ark. 313, 547 S.W.2d 760 (1977); *Manpower, Inc. v. Hedgecock*, 42 N.C. App. 515, 257 S.E.2d 109 (1979).

In the case before us American employed Vodra, who had no background in the field of security services. Displaying enhanced credentials in the racetrack security field as a result of its successful performance at the State Fairgrounds, American

submitted its proposals to provide security at Fonner Park. In the course of such transactions, Vodra was introduced to Fonner Park's management. It was American's ostensibly good reputation as a provider of security services, not Vodra's personal efforts, which more than likely induced Fonner Park to enter contracts with American for security services. The good will in this case is consequent to the business conducted by American and, as far as we can see in the record, would have been obtained without Vodra's presence or participation. Early in 1983, Fonner Park inquired whether American would provide services in 1984 on the basis of the 1983 contract, a manifest indication that Fonner Park would return to American for security services in 1984. Such demonstrated disposition cannot be disregarded or ignored as evidence of American's good will regarding Fonner Park. Vodra attempted to capitalize on a relationship built on American's expenditures of time and effort, thereby appropriating American's good will. Under the circumstances we find that Vodra's actions were unfair competition to American and that the postemployment covenant not to compete was reasonably necessary to protect American's legitimate business interest in customer good will. "A covenant not to compete, as a partial restraint of trade, is available to prevent unfair competition by a former employee . . . ." *Boisen v. Petersen Flying Serv., ante* p. 239, 248, 383 N.W.2d 29, 34 (1986).

Reasonableness of a specific restrictive covenant must be assessed upon the facts of a particular case and must be determined on all the circumstances. See *U-Haul Co. of Central Illinois v. Hindahl*, 90 Ill. App. 3d 572, 413 N.E.2d 187 (1980). The restriction imposed by a covenant not to compete must be "no wider in scope than is necessary to protect the business of the employer." *Manpower, Inc. v. Hedgecock, supra* at 521, 257 S.E.2d at 114. "[A] restraint is reasonable only if, taken as a whole, its dimensions are proportioned in relation to each other so as to keep the burden on the employee down to the minimum consistent with reasonable protection to the employer's legitimate interests." Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 675 (1960). "[A] contract to restrict a laborer from engaging in an occupation, if valid at all,

must be restricted to the area in which the personal service was performed." *Brewer v. Tracy,* 198 Neb. 503, 506, 253 N.W.2d 319, 322 (1977).

Time and space restraints of the covenant not to compete in this case were triggered upon existence of the three situations or conditions specified in the covenant. The restrictive covenant precluded Vodra's acquisition of only two customers—Fonner Park and the State Fairgrounds. Vodra was not unconditionally prohibited from seeking customers within the sales territory covered during his employment with American. Rather, the covenant not to compete prohibited Vodra's soliciting American's customers contacted in the combined circumstances, conditions, or situations specified in that covenant. Such restriction on Vodra, as a former employee of American, provides minimal restraint on competition and is reasonable. The covenant's time restriction is also valid because, given an applicable customer or former customer, American has a legitimate interest in protecting its customer good will for a reasonable period of time. Under the circumstances a 3-year restriction was reasonable to protect American's significant good will with its racetrack customers.

This brings us to the final question, whether the restriction is "reasonable in the sense that it is not unduly harsh and oppressive on the employee." *Securities Acceptance Corp. v. Brown,* 171 Neb. 406, 417, 106 N.W.2d 456, 463 (1960).

In *Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 317 N.W.2d 900 (1982), this court recognized a "balancing test" to be applied in determining whether the restraint of a postemployment covenant not to compete is unduly harsh or oppressive and, therefore, unenforceable. The factors or considerations involved in such balancing test, required by *Philip G. Johnson & Co. v. Salmen, supra* at 128, 317 N.W.2d at 904, are

> the degree of inequality in bargaining power; the risk of the covenantee losing customers; the extent of respective participation by the parties in securing and retaining customers; the good faith of the covenantee; the existence of sources or general knowledge pertaining to the identity of customers; the nature and extent of the business

position held by the covenantor; the covenantor's training, health, education, and needs of his family; the current conditions of employment; the necessity of the covenantor changing his calling or residence; and the correspondence of the restraint with the need for protecting the legitimate interests of the covenantee.

As required by *Philip G. Johnson & Co. v. Salmen, supra*, harshness and oppressiveness on the covenantor-employee is weighed against protection of a valid business interest of the covenantee-employer. However, in the balancing test applied to a postemployment covenant not to compete, there is no arithmetical computation or formula required in a court's consideration of the factors involved or to be considered. The factors or considerations to be used in that balancing test are not weighted; that is, there is no prescribed method by which more or less weight is assigned to each factor to be considered in the balancing test required by *Philip G. Johnson & Co. v. Salmen, supra*.

Applying the balancing test to the present case, protection of American's good will outweighs any hardship which enforcement of the covenant may have on Vodra. Vodra had no training nor experience in security service before his employment with American. Any knowledge acquired by Vodra concerning security work was gained through on-the-job training as an American employee. Vodra is 33 years old, unmarried, and in good health. Enforcement of the covenant will not require Vodra to move from his home in Omaha, nor will enforcement absolutely and totally restrict Vodra's activities within his former sales territory for American. While at American, Vodra participated in the acquisition of the Fonner Park account and serviced that account for 2 years. It was, however, the market position and good will of American which was instrumental in American's acquiring the Fonner Park account. The record discloses nothing to prevent the inference that Fonner Park would have chosen American regardless of Vodra's participation in the process of providing security services for Fonner Park. American acted in good faith in drafting a narrow covenant not to compete. Vodra's actions in acquiring the Fonner Park account are somewhat suspect.

Vodra admittedly failed to expend his best efforts to secure the 1984 Fonner Park contract for American and then subsequently capitalized on his American-based relationship with the Fonner Park management by obtaining a contract for his own corporation.

The restriction imposed upon Vodra by the postemployment covenant not to compete is not unduly harsh and oppressive on Vodra and is, therefore, reasonable. American is entitled to injunctive relief. We reverse the judgment of the district court and remand this matter to the district court with direction to grant the appropriate injunctive relief pursuant to the request by American.

Finally, American requested an accounting, which was denied when the district court denied injunctive relief.

An action for accounting may, under one set of circumstances, find its remedy in an action at law and, under another, find it within the jurisdiction of equity. Where . . . the intimate relationships of the parties are involved, an adequate remedy was available only within the equitable jurisdiction of the court.

*Philip G. Johnson & Co. v. Salmen*, 211 Neb. 123, 124, 317 N.W.2d 900, 902 (1982). Generally, in order to be entitled to the equitable remedy of accounting, it is necessary to show a fiduciary or trust relationship between the parties, or a complicated series of accounts, making the remedy at law inadequate. *Jasa v. City of Omaha*, 218 Neb. 314, 352 N.W.2d 913 (1984). See, also, *Lustgarten v. Jones*, 220 Neb. 585, 371 N.W.2d 668 (1985). An action for an accounting must generally allege the plaintiff demanded and the defendant refused to render an accounting. *Harmon Care Centers v. Knight*, 215 Neb. 779, 340 N.W.2d 872 (1983). In an accounting action the burden is upon the plaintiff to establish his right to the accounting. *Barthuly v. Barthuly*, 192 Neb. 610, 223 N.W.2d 429 (1974). American in its petition raised its claim for an accounting. Evidence in this case has established the "intimate, fiduciary, or trust" relationship between American and Vodra, a former supervisor and manager who had close personal contact with American's customers. American is entitled to an equitable accounting, and we remand this matter to the district

court for further proceedings consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTION.

KRIVOSHA, C.J., concurring.

I concur in the result reached by the majority in this case and, in the main, agree with the majority's analysis. I would not, however, have determined, as the majority has, that the three situations or conditions activating the covenant were inclusive. The evidence in this case establishes that such a decision is not necessary in view of the fact that all three conditions were met. I would not wish to leave the impression that in every instance in which a contract contains a series of conditions preceded by letter that the conditions are inclusive rather than exclusive.