Jay Thomas **GOLD**, et al., Plaintiffs,

v.

**HOLIDAY RENT-A-CAR INTERNATIONAL, INC.,**
Defendant.

No. 85–1382–CV–W–3.

United States District Court,
W.D. Missouri, W.D.

Dec. 16, 1985.

Mark Klein, Kansas City, Mo., for plaintiffs.

Frederick H. Riesmeyer, II, Kansas City, Mo., for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR A PRELIMINARY INJUNCTION

ELMO B. HUNTER, Senior District Judge.

Plaintiffs, Jay Gold and Gold & Son, Inc., (Gold), entered into a license agreement (agreement) with Holiday Rent-A-Car International, Inc., to purchase and operate its Kansas City, Missouri, franchise. Holiday/Payless Rent-A-Car International, Inc. (Holiday) has succeeded in interest to Holiday Rent-A-Car International, Inc. Gold filed suit in Jackson County Court on September 25, 1985, alleging breach of contract and fraud. Holiday filed a counterclaim, including a count for injunctive relief. Holiday seeks to enforce a covenant not to compete, the transfer of the phone numbers utilized by Gold while operating the Holiday franchise, and an assignment of the lease of the Holiday location at the Kansas City International Holiday Inn, 11832 Plaza Circle, all of which are provided for in the agreement. The agreement provides that Florida law will control any suit arising under the agreement. Holiday removed the case to this Court pursuant to 28 U.S.C. § 1441(a). A hearing was held on the preliminary injunction.

On January 6, 1983, Gold entered into an option agreement with Holiday to purchase its Kansas City franchise for a sum of thirty thousand ($30,000.00) dollars. Gold signed a license agreement with Holiday to purchase the franchise on January 18, 1985. The agreement provided an exclusive license to operate the franchise in the counties of Jackson, Clay and Platte in Missouri, and Johnson and Wyandotte in Kansas. The franchise had been operated as a company franchise prior to the purchase for a period of one year. Thus, Gold purchased an ongoing business complete with location phone service, employees and customers. Gold assumed actual operation of the franchise in late January of 1985. Between the time Gold signed the agreement and the time he assumed actual operation of the franchise, he received a one week training course at the headquarters of Holiday in Florida.

As time went on Gold became disenchanted with the Holiday system and eventually in March of 1985, began talks with the officials of American International Rent-A-Car, Inc., (American), a competitor of Holiday. American did not have a franchise in the Kansas City area. On March 14, 1985, Gold sent a letter to American stating that he had developed a strategy regarding the noncompetition clause contained in the Holiday agreement. The strategy was to gain the attention of Holiday officials by withholding franchise fees owed and then suggest that each party go its own way.

On March 28, 1985, Gold was offered a franchise of American for twenty thousand ($20,000.00) dollars. The franchise area was the same as that covered by the Holiday agreement. Sometime between April and June of 1985, Gold began to accept American rentals at the Holiday franchise location. Statements of dues and rental data were prepared for the months of June and July for business between Gold and American. Also, in June Gold placed an order for American supplies.

Gold sent a letter to Holiday, on July 3, 1985, indicating that he no longer wished to operate the Holiday Kansas City franchise. Holiday responded on July 8, 1985, making reference to the noncompetition clause of the agreement. On July 30, 1985, Holiday notified Gold that his franchise would be terminated in ninety (90) days or on October 30, 1985, if he had not paid the franchise fees which were in arrears. The fees were not paid.

Gold continued to accept both Holiday and American rentals during the spring and summer of 1985. Holiday officials gained actual knowledge that Gold was accepting American rentals at the Holiday franchise locations on September 16, 1985.

Gold states that the license agreement with American was not formally entered into until August or September of 1985. The license agreement, however, is dated March 31, 1985. The evidence shows at the very least that Gold was operating as a de facto licensee of American as early as April 1985.

█ The Holiday agreement and its terms are undisputed. It provides that Gold will not compete with Holiday for a period of two years commencing upon the effective termination of the agreement. The Court finds that the agreement was effectively terminated on October 30, 1985, as provided in the letter to Gold on July 30, 1985. The geographic scope of the covenant is limited to a seventy-five (75) mile radius of the license area. Both Missouri, see *National Starch and Chemical Corp. v. Newman*, 577 S.W.2d 99, 104 (Mo.App. 1979), and Florida, see Fla.Stat. § 542.-33(2)(b), enforce covenants not to compete if reasonably limited as to time, area and scope. The covenant in the present case meets those requirements.

█ The agreement, also, provides that any remaining lease period will be assigned to Holiday upon termination of the agreement if Holiday so instructs Gold. Furthermore, it provides that all phone numbers used in connection with the Holiday franchise are assigned to Holiday upon termination of the agreement.

The Eighth Circuit Court of Appeals has developed a four part test to be utilized in determining whether a preliminary injunction should issue. These four parts are: (1) the threat of irreparable harm to the movant; (2) a balancing of the hardships between the respective parties; (3) the movant's likelihood of success on the merits; and (4) the public interest. See, *Data-*

*phase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981).

There is a threat of irreparable harm to Holiday. Holiday turned over to Gold an ongoing franchise in January of 1983. Its fleet of vehicles was leased to Gold. It assigned its lease at the Kansas City International Holiday Inn to Gold. Gold has executed new leases on these premises. In April-June 1985, Gold began accepting rentals from American customers at the Holiday office. He continued to conduct a dual business out of the Holiday franchise at least until September of 1985. Because Gold had an exclusive license, Holiday does not have another franchise in Kansas City. Gold has diverted both potential and future customers from the Holiday system by use of the phone numbers listed in Holiday advertisements including the Yellow Pages, customers who use the rental system due to its location and past satisfied customers of the Holiday system. This loss of business continues today. Gold still uses one of the telephone numbers listed in the Yellow Pages as a Holiday number to conduct business for his American franchise and as late as November was using another phone number for the same purpose. There is a continuous harm being suffered by the goodwill of the Holiday system. It would be extremely difficult to calculate the amount of damages which Holiday has suffered and will continue to suffer because of the breach of the franchise agreement.

A balancing of the hardships between the respective parties reveal that the equities in the case are fairly balanced. If an injunction is issued Gold will not be able to compete for car rental business within the area designated in the agreement. He has a fleet of approximately 65 vehicles which he will not be allowed to operate. Plus, he will not be able to operate the American franchise which he purchased.

Holiday, on the other hand, continues to be harmed in that it no longer has a franchise operating in the Kansas City market. Allowing Gold to continue to operate the American franchise in the market not only presents competition for Holiday, but also,

destroys Holiday's only business in the market. Gold did not inform anyone with the Holiday system when he first began operating the American franchise. Instead he chose to operate the American franchise in a clandestine fashion out of his Holiday location. The businesses of the two competitors were operated side by side out of the same location without the knowledge of anyone at Holiday. Gold was aware of the covenant not to compete in early March, 1985, as he had written American that he had developed a plan to get around the covenant. Even before this plan could produce any results Gold began accepting American rental customers. Gold willfully and intentionally breached the covenant not to compete and for a period of several months attempted to conceal this breach from Holiday. Under these circumstances the equities simply do not favor Gold. See, *Sigma Chemical Co. v. Harris*, 586 F.Supp. 704, 711 (W.D.Mo.1984).

Holiday has shown that it has a high likelihood of success on the merits. The agreement and its terms are undisputed. For Holiday not to succeed on the merits, Gold must prove that the agreement was induced by fraud. See, *Huttegger v. Davis*, 599 S.W.2d 506, 511 (Mo.1980). Before addressing each allegation of fraud it is important to note several of the facts. One, Gold operated the Holiday franchise for over two years, accepting the benefits derived from the agreement. Two, Gold was aware of the restrictive covenant and its effects. Three, while operating under the license agreement with Holiday, Gold began negotiations with American concerning the purchase of a franchise. Four, Gold wrote American that he had developed a plan to get around the covenant and its effects. Five, Gold accepted American rentals while still operating the Holiday franchise and did so for a period of at least five months without the knowledge of Holiday. Six, the first time Gold alleged that the agreement was induced by fraud was with the filing of the complaint in this case.

Gold made approximately eight allegations of fraud. First, Gold alleges that he was to receive depreciation rebates on the fleet of vehicles at the Kansas City franchise when he purchased it. The option agreement provided that Gold would purchase the vehicles currently being used at the franchise. The purchase, however, was subject to Ford Credit Corp. (Ford), approving the assumption of Holiday's loan on the vehicles by Gold. Gold was not able to meet the credit requirements of Ford. Because Gold was not able to assume the loan the agreement was modified. Holiday now would lease the vehicles to Gold at its cost from Ford. The modification agreement provided that the owner of the vehicles would receive the depreciation rebates. The owner was Holiday.

Second, Gold alleges that fleet insurance was to be provided at cost by Holiday. There is not persuasive evidence to support this allegation in the record. Furthermore the agreement allows Gold to secure his own fleet insurance if he can obtain a better rate. On one occasion Gold did so. Certain administrative expenses and a potential for a profit if losses for a given period are low are calculated into the rate Holiday is going to charge its franchisees that purchase fleet insurance from it. Gold includes these very same factors in the amount he charges car rental customers who purchase liability insurance on their rental car. Gold stated that he would not object to the inclusion of the administrative expenses into the calculation of his premium rate as long as he would have been informed of it. This statement indicates that even if the representation was made that fleet insurance would be sold at cost, it was not a substantial factor inducing Gold into the agreement.

Third, Gold alleges that Holiday stated that the Kansas City franchise had a substantial amount of government business. In 1982, Holiday had been awarded the GSA contract for Kansas City. The contract is bid out each year as provided in government regulations. Holiday bid on the 1983 contract. In late December, 1982, Holiday learned that the contract probably would be awarded to Thrifty Rent-A-Car, a competitor. The GSA bidding process fa-

vors small businesses. Holiday contacted the GSA, believing that in the preceding year Thrifty had conducted too much business to be classified as a small business. It was not until February, 1983, that Holiday learned that its attempt had been unsuccessful and that the GSA contract had been awarded to Thrifty. Holiday did not represent that it would or had secured the GSA contract for 1983 to Gold. Gold was informed of the correspondence with the GSA as early as January 20, 1983. Even after learning that the contract had been awarded to Thrifty, Gold did not make any allegations of fraud to Holiday concerning this subject matter.

Fourth, Gold alleges that Holiday made false representations about the accounting training which he would receive as a licensee of the system. Holiday instructed Gold on the proper method of keeping the day to day records of the franchise during his week training session in Florida. An official of Holiday later gave Gold some supplemental training at the Kansas City franchise. Gold testified that he believed that Holiday was going to give him an extensive training course in accounting which would enable him to perform all of the accounting work for the franchise. The Court finds that there is simply not persuasive evidence to establish this allegation.

Fifth, Gold alleges that Holiday misrepresented that it was the fifth largest car rental system in North America. Gold has no personal knowledge that this statement is false. His basis for the allegation is from magazine articles which he has read. Les Netterstrom, president and majority stockholder of Holiday, testified that the statement is based upon the number of locations being operated by Holiday. He further stated that he believes the statement to be true. Gold has not presented persuasive evidence to establish the allegation that Holiday was not the fifth largest car rental system in 1982.

Sixth, Gold alleges that Holiday misrepresented that it had numerous corporate accounts. Gold was shown a list of companies which had received a discount card from Holiday. A company's name could appear on the list either by a local licensee requesting a discount card for the company or by a company employee simply applying for a card. The city and state of the company's headquarters is listed alongside the company's name on the corporate list. This should alert the reader that many of the businesses listed on the corporate account list were of a local nature. Gold stated that he believed that he would derive business from the accounts on the list. Gold testified that to the best of his knowledge only once in the two years that he operated the Holiday franchise was a discount card presented for use. Les Netterstrom testified that the employees of the companies receiving the discount cards were not required to use Holiday, rather it was a service provided by Holiday for the companies to utilize at their option. The Court does not find persuasive evidence to support Gold's allegation that the corporate account list was materially misrepresented.

Seventh, Gold alleges that Holiday made financial misrepresentations as to the expenses incurred by the Kansas City franchise during the months of May through October 1982. Holiday provided Gold with a profit/loss statement for those months prior to his purchase of the franchise. The profit/loss statements were prepared on a cash flow basis rather than an accrual basis. Gold claims that the accounting method used by Holiday in preparing the statements should have been disclosed. He testified that the expenses incurred by the franchise were misstated because certain expenses which were paid at the first of the year should have been amortized over the entire year. Holiday did not make any representations as to the accounting method used to prepare the profit/loss statements. There is not any testimony in the record that the accounting method used by Holiday is not acceptable in the accounting community. The Court does not find persuasive evidence in the record to support an allegation of fraudulent misrepresentation.

Eighth, Gold alleges that Holiday stated that group insurance was available to the licensees and their employees. Holiday has no such program. Les Netterstrom testified that such a statement did appear in the Holiday Procedure Manual given to Gold. He characterized the statement as a mistake in the manual. Holiday did attempt to provide a group life and health plan for its licensees in 1984, however, there was not sufficient interest on the part of the licensees to make a group plan financially feasible. Gold learned in early 1983 that Holiday did not actually provide a group insurance plan for its licensees and took no action against Holiday at that time. The Court does not find persuasive evidence to establish that the group insurance was a material factor inducing Gold to enter the agreement.

The Court finds that there is not persuasive evidence to establish the allegations of fraud in the inducement attempted to be proven by Gold. The Court, thus, concludes that Holiday will likely succeed on the merits in its claim for permanent injunctive relief against Gold.

There is a public interest in granting an injunction in this case. The public has an interest in enforcing covenants not to compete contained within valid contracts as long as the covenant is reasonably limited in scope, duration and geographic region. See *Sigma Chemical Co.*, at 711.

The Court holds based upon its application of the *Dataphase* test, that a preliminary injunction should issue in this case. The Court hereby orders Jay Gold and Gold & Son, Inc., on or before December 30, 1985, to:

(1) execute all documents necessary to assign and transfer to Holiday the balance of the lease of the premises located at 11382 Plaza Circle, as set out in the license agreement;

(2) transfer each and every phone number used by Gold and Gold & Son, Inc., in connection with the advertisement of the Holiday franchise in Kansas City, as set out in license agreement; and

(3) refrain from violating the covenant not to compete contained within the license agreement with Holiday, for a period of two years commencing on October 30, 1985, for the geographic region of Clay, Jackson and Platte counties in Missouri, and Johnson and Wyandotte counties in Kansas and for a seventy-five (75) mile radius surrounding such region.

SO ORDERED.