**O.V. MARKETING ASSOCIATES, INC., Plaintiff,**

**v.**

**Charles C. CARTER and Sports, Inc., Defendants.**

No. 90–1551–C.

United States District Court, D. Kansas.

May 22, 1991.

Terry L. Malone & Brian Burris, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for plaintiff.

Daniel K. Diederich, Kennedy, Berkley, Yarnevich & Williamson, Chtd., Salina, Kan., Roger Sherwood, Sherwood, Harper & Gregory, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

Plaintiff, O.V. Marketing Associates, Inc. ("O.V."), is the franchisor of "Olympia Village" sporting goods stores. Plaintiff filed this action alleging the defendant, Charles C. Carter, a franchisee, breached his franchise agreement. Plaintiff sought monetary damages and specific performance or injunctive relief on the restrictive covenant. Both sides filed dispositive motions which the court decided in the order of March 20, 1991. Specifically, the court held that the franchise agreement of February 14, 1985, governed the parties' relationship and that Charles Carter had breached that agreement in unilaterally terminating it before the end of its ten-year term. Defendant Carter then confessed a money judgment in favor of the plaintiff in the amount of $147,191.93 with post-judgment interest at the contract rate of eighteen percent (18%).

The case proceeded to a trial before the court on April 24 and 25, 1991, on the sole issue whether the restrictive covenant is valid and enforceable. The parties have submitted their supplemental and amended suggested findings of fact and conclusions of law. Having reviewed those pleadings and having heard the evidence and arguments, the court is prepared to enter its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. Plaintiff has requested that the court adopt the statement of uncontroverted facts in the order of March 20, 1991, as findings of fact in the trial. Defendants have voiced no objection to this request. Because the uncontroverted facts provide a necessary background, the court will include them in its findings of fact.

## FINDINGS OF FACT

1. Plaintiff O.V. is the franchisor of "Olympia Village" sporting goods stores. In 1977, Tom Swiatoviak and a partner opened a sporting goods store in Grand Island, Nebraska. Their success lead them to open seven or eight additional "Olympia Village" stores in other communities and even in other states. Continuing success took their business venture to the next step of franchising. They created manuals, plans, form agreements and marketing techniques for their franchise business.

2. When a franchise application was received, O.V. evaluated the applicant's financial statement, the proposed store site and surrounding community, and also personally met with the applicant. O.V.'s franchise business grew to a total of twenty-five franchise stores. O.V. currently has no franchisees, as most left in 1988 through 1990. There are three Olympia Village stores still operating and each is company-owned by O.V.'s sister corporation, W.O.V., Inc.

3. Defendant Charles C. Carter is forty-eight years old and the father of five children. His employment history began after four-years of service with the Air Force as an aircraft mechanic when he started working in retail tire sales for B.F. Goodrich and Goodyear. He later went to work for Farmland Industries as a petroleum specialist and eventually became the manager of the Junction City Co-op. He received training for each of these positions and, in particular, six months of intensive management training for his job as a Co-op manager. The Junction City Co-op later became a franchisee of Western Auto, and Carter received more training to manage that franchise. Carter quit his position with Co-op in 1984 after certain disputes arose.

4. In late 1984, Carter responded to an advertisement for Olympia Village franchises. Negotiations between Carter and O.V. representative occurred over a four to six month period. Carter was presented with O.V.'s standard franchise agreement and was told that some terms therein were negotiable while others were not. O.V.'s representative, Ray O'Connor, said the re-

strictive covenant was a term "cast in concrete."

5. On or about February 14, 1985, O.V. and Carter entered into a franchise agreement whereby an Olympia Village franchise was issued to Carter according to specified terms and conditions. Before he signed the contract, Carter read it and got the advice of his counsel on its contents. The franchise agreement was prepared by or on behalf of O.V. The parties also attached to their agreement an addendum reflecting changes to the form agreement as a result of their negotiations. Carter had wanted additional exclusive franchise rights to the towns of Salina, Topeka and Manhattan. The final agreement gave him rights only to Junction City and Manhattan, but a representative of O.V. orally promised Carter a first option on any franchise in Salina.

6. Before Carter opened his Junction City store in April of 1985, O.V. provided him with a franchisee manual, assisted him in ordering his initial inventory and preparing his store for its opening, and provided him with forms for ordering merchandise and monitoring inventory. Also in advance of his store's opening, Carter visited O.V.'s Grand Island headquarters where he received limited instruction. After his store opened, Carter used the inventory system suggested by O.V. for approximately sixty days and then abandoned it in favor of another method. Carter found the record keeping instructions and training offered by O.V. so inadequate that he primarily resorted to forms he had used while manager at the Junction City Co-op. Without any assistance from O.V., Carter put his inventory and bookkeeping functions on a computer in 1986. Of the materials and training given to its franchisees, O.V. considers its franchisee manual, the advertising calendar and inventory methods to be trade secrets.

7. W.O.V., Inc., a sister corporation to O.V., opened a company-owned Olympia Village store in Salina in 1987. Carter learned of the store approximately three months after it opened. He asked O.V. representatives why he was not given the first option to a Salina store as had been promised. Negotiations then commenced over Carter's purchase of the Salina store.

8. On or about August 1, 1988, W.O.V. sold its Salina store to Carter. Paragraph 3(f) of the sales agreement reads:

f. *FRANCHISEES.* Both Seller and Buyer acknowledge that they are franchise holders of O.V. Marketing Associates, Inc., a Nebraska Corporation, and W.O.V., Inc. is selling and Charles Carter is buying W.O.V.'s franchise rights to the Salina, Kansas store and Buyer is not purchasing a new franchise from O.V. Marketing Associates, Inc. Buyer covenants and agrees that Buyer shall continue to operate the Olympia Village store in Salina, Kansas, under his Franchise Agreement with O.V. Marketing Associates, Inc. dated February 14, 1985, and all Amendments and Addendums thereto, and shall continue to adhere to all agreements of the Franchise Agreement with O.V. Marketing Associates, Inc. as set forth in Buyer's Franchise Agreement. O.V. Marketing Associates, Inc. shall consent to the sale by signature to this document.

Defendant Carter read the entire sales agreement, including this clause, before he signed it. As part of his purchase of the Salina store, Carter and O.V. also executed an addendum to the original franchise agreement expanding the franchise territory to include the city limits of Salina, Kansas.

9. The Salina store was located in the Mid States Mall which had suffered a number of recent vacancies, including one of its anchor tenants, Montgomery Ward. Sales were poor and declining at the Salina store when Carter purchased it. Carter moved the store to a larger space in the Mid States Mall shortly after he purchased it and sales increased some. A new mall, Central Mall, was being built in Salina and retail shops were moving there. O.V. representatives advised Carter that he should also move his store to Central Mall when the lease in the Mid States Mall expired. The Salina store was operated under the trade name of "Olympia Village," and Car-

ter paid royalties pursuant to the original franchise agreement and addendum, and used Olympia Village's packaging, advertising material, and buying group.

10. At the time of the Salina store purchase, O.V. only provided Carter with the accounting books to the store and did not supply a customer list, an advertising plan or any other trade secrets.

11. Carter then sought and received the consent of O.V. to sell the Junction City store. A dispute arose when O.V. insisted that Carter owed a transfer fee on this sale. This dispute eventually lead to the termination of the franchise relationship and this litigation.

12. Carter developed some new marketing techniques at his Salina store. He asked customers to sign a register and disclose their birthdates. Carter then mailed them promotional discounts on their birthdays. Carter also used this as a customer mailing list for other promotions. High school athletes were employed on a part-time basis so as to create communication lines for high school team sales.

13. Carter successfully negotiated with Central Mall a lease for his store that increased its size by nearly 1,000 square feet.

14. In early 1988, franchisees including Carter were disappointed with O.V.'s buying program which had been intended to provide the franchisees with buying discounts on their orders from certain wholesalers and manufacturers. Because of the franchisees' complaints and O.V.'s cash flow problems with running the program, O.V. abandoned the buying program and reduced the royalty rates to be paid by the franchisees. This change in the franchise agreement is reflected in the addendum entered into on May 12, 1988.

15. By letter dated October 27, 1989, through Carter's legal counsel, Daniel Diederich, addressed to plaintiff's legal counsel, William Francis, defendant Carter unilaterally terminated his franchise agreement effective October 31, 1989. On November 1, 1989, plaintiff opened his store in Central Mall under the name of "Sports Village." Defendant Sports, Inc. was incorporated in October of 1989 to operate the new store. The issued stock was divided equally between Carter and his wife.

16. Carter did not advertise that his new store was in any way connected to the former "Olympia Village." He does not use the good will associated with "Olympia Village" in the current operation of his store. The inadvertent placement of one "No Smoking" sign having the "Olympia Village" logo on it does not create the real likelihood of consumers being confused or of good will being exploited. O.V. did not advertise in the Salina area after November 1, 1989.

17. After the move to Central Mall, sales in Carter's sporting goods store more than doubled. Based upon his customer list and a recent sampling of customer checks, Carter estimates that his trade area extends east for twenty-eight miles, west for ninety-four miles, north for seventy-nine miles, and south for sixteen miles. Carter advertises in the Salina newspaper, in the Salina yellow pages, in the North Central Kansas Feist area directory, in direct mailers and with Salina radio stations.

18. After the court's summary judgment order, Carter sold his fifty percent interest in Sports, Inc. to his wife. He also resigned from the positions of officer and director of Sports, Inc. He currently manages Sports Village and draws a salary as its only full time employee. Carter is still guarantor on a $25,000 promissory note of Sports Inc. In operating the Sports Village, Carter is not using any skills, methods, trade secrets or training provided by O.V. Instead, Carter primarily relies on his earlier retail experiences and training, as well as what he has learned from running his own sporting goods store.

19. Paragraph 18(c) of the franchise agreement contains a restrictive covenant which provides:

> Upon termination of this Agreement, for any of the events set forth in subparagraphs a, b, c, d and e of Paragraph 17 (if the termination affects all stores operated by Licensee under this Agreement), Licensee shall cease to operate and shall close all stores being operated under this

Agreement and Licensee, Guarantor or any subsidiary or parent corporation of Licensee or Guarantor or any affiliate of Licensee or Guarantor shall not directly or indirectly engage or participate in, as owner, principal, employee or agent or through any subsidiary, or furnish financial or other aid or support to, any business enterprise or undertaking which sells athletic goods or athletic shoes for a period of three (3) years within fifty (50) miles of any store of Licensee which had been established pursuant to the terms of this Agreement.

This covenant appeared in the standard franchise agreement. Its temporal and geographical scope was not unique to the Junction City or Salina stores but was common in all Olympia Village franchise agreements. O.V.'s rationale for the three-year and fifty-mile restriction was that its franchise stores were typically located in area malls having trade areas of approximately fifty miles and that it generally took a franchise store approximately three years to establish some financial stability. O.V. believes the restrictive covenant ensures that a franchisee "lives up to its bargain" of paying royalty fees for the term of the agreement.

20. O.V. would like to place another store in Salina, in particular the Central Mall, but it believes this store could only succeed if the Sports Village was not also there. O.V. admits that it has no franchisees and that a Salina store would probably be company-owned by one of its sister corporations.

21. Carter's income from Sports Village significantly contributes to his family's income and support. If he were not able to manage the store, his family would assume the responsibilities which would probably cause his sons to cut short their college education and return home to operate the store. The monetary judgment confessed by Carter severely limits his financial opportunities for opening other retail sporting goods stores. Carter does not have other readily marketable skills.

## CONCLUSIONS OF LAW

1. A court exercising diversity jurisdiction must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Kansas choice-of-law rules permit the courts to enforce the law agreed to by the parties in their contract. *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1360 (10th Cir.1990); *Ritchie Enterprises, Inc. v. Honeywell Bull, Inc.*, 730 F.Supp. 1041, 1046 (D.Kan.1990). Since the parties agreed in the Franchise Agreement that Nebraska law would govern their contractual relationship, the court will apply Nebraska law in determining the enforceability of the restrictive covenant.

2. Carter contends the restrictive covenant is unreasonable and, therefore, is unenforceable. Plaintiff has the burden to establish the reasonableness of the restrictive covenant. *National Farmers Union Service Corp. v. Edwards*, 220 Neb. 231, 369 N.W.2d 76, 80 (1985). Contractual provisions restraining competition are not looked favorably upon and will be construed narrowly. *Griffeth v. Sawyer Clothing, Inc.*, 202 Neb. 631, 276 N.W.2d 652, 655 (1979) (Restrictive covenant in the sale of a business). Nebraska courts have not squarely addressed the standards of reasonableness for a restrictive covenant in a franchise agreement. Nebraska courts have applied a stricter standard against restrictive covenants appearing in employment contracts as opposed to agreements for the sale of a business. Compare *Standard Meat Co. v. Feerhusen*, 204 Neb. 325, 282 N.W.2d 34 (1979) and *D.W. Trowbridge Ford, Inc. v. Galyen*, 200 Neb. 103, 262 N.W.2d 442 (1978) (Restraints ancillary to the sale of a business or property are reasonable if made in good faith and are necessary to protect a party) with *Vlasin v. Johnson & Co., Inc.*, 235 Neb. 450, 455 N.W.2d 772 (1990), and *Boisen v. Petersen Flying Service, Inc.*, 222 Neb. 239, 383 N.W.2d 29 (1986) (Restrictive covenants in employment contracts must satisfy three requirements and are not enforceable merely to protect the employer from ordi-

nary competition). The general rule in other jurisdictions is to hold restrictive covenants appearing in franchise agreements to the same standards governing restrictive covenants in employment contracts. See *South Bend Consumers Club v. United Consumers Club*, 572 F.Supp. 209, 213 (N.D.Ind.1983), *appeal dismissed*, 742 F.2d 392 (7th Cir.1984); *H & R Block, Inc. v. Lovelace*, 208 Kan. 538, 545–46, 493 P.2d 205 (1972) ("Under these narrow facts we are inclined to the view the [franchise] contract is more akin to one of employment than to a contract for sale or disposition of a business and sufficiently of that character to make strict construction against the promisee appropriate."); Annot. 50 A.L.R.3d 746, 748 (1973).

■ 3. Plaintiff contends the less demanding standard should be applied here because the franchise concerns a retail sporting goods store as opposed to one for personal services as was addressed by the Kansas Supreme Court in *H & R Block*. The fact that the franchise in *H & R Block* involved a service instead of goods is a distinction without force in the case *sub judice*. The relationship between O.V. and its franchisees did not entail its sale of items or goods to the franchisees for resale. In fact, the franchisees were expected to buy quality merchandise from various sources and to run their stores in a manner consistent with the requirements imposed on all Olympia Village stores. The Olympia Village franchise focused on the manner of sales rather than the actual goods being sold. If anything, the Olympia Village franchise more resembled a service-type franchise rather than a goods-type franchise. The failure of this distinction supports the analogy to an employment contract.

Moreover, the restrictive covenant was not ancillary to the sale of a business. O.V. did not sell the Salina store to Carter. O.V.'s sister corporation, W.O.V. sold the Salina store and required Carter to operate it as a franchise store under O.V.'s existing agreement with Carter. O.V., the franchisor and not the seller, is the only named party protected by the restrictive covenant in the franchise agreement. Carter's success in negotiating certain minor changes to the standard franchise agreement does not evidence a parity in bargaining strength. Under the facts of this case, the franchise agreement is more akin to an employment contract rather than a contract for the sale of a business.

4. In Nebraska, the validity of partial restraints of trade in employment contracts have been evaluated against three balancing requirements:

First, is the restriction reasonable in the sense that it is not injurious to the public; second, is the restriction reasonable in the sense that it is no greater than is reasonably necessary to protect the employer in some legitimate interest; and, third, is the restriction reasonable in the sense that it is not unduly harsh and oppressive on the employee.

*American Sec. Services, Inc. v. Vodra*, 222 Neb. 480, 385 N.W.2d 73, 78 (1986).

■ 5. Preliminary to these balancing requirements, the court considers what legitimate interest of the employer is served by the restrictive covenant. Protection against improper and unfair competition, as contrasted to ordinary competition, is a legitimate interest. *Boisen*, 383 N.W.2d at 33. The Nebraska Supreme Court has further explained:

To distinguish between "ordinary competition" and "unfair competition," courts and commentators have frequently focused on an employee's opportunity to appropriate the employer's goodwill by initiating personal contacts with the employer's customers. Where an employee has substantial personal contact with the employer's customers, develops goodwill with such customers, and siphons away the goodwill under circumstances where the goodwill properly belongs to the employer, the employee's resultant competition is unfair, and the employer has a legitimate need for protection against the employee's competition. (Citations omitted). Also, an employer has a legitimate need to curb or prevent competitive endeavors by a former employee who has acquired confi-

dential information or trade secrets pertaining to the employer's business operations. (Citations omitted). From the foregoing we glean that an objective of a covenant not to compete is prevention of an employee's competitive use of information or a relationship with a customer or client, which pertains peculiarly to the employer and has been acquired in the course of the employee's employment with the employer. (Citation omitted).

On the other hand, "[p]ost-employment restraints are scrutinized with particular care," and "[a] line must be drawn between the general skills and knowledge of the trade and information that is peculiar to the employer's business." Restatement (Second) of Contracts § 188, Comment g. at 45 (1981). Ordinarily, an employer has no legitimate business interest in postemployment prevention of an employee's use of some general skill or training acquired while working for the employer, although such on-the-job acquisition of general knowledge, skill, or facility may make the employee an effective competitor for the former employer. (Citations omitted). "An opportunity to develop good will which is no different from the opportunity any other like employee in the industry would have with some other firm is not traceable to the particular position and situation of the employer." Corbin on Contracts § 1391B at 574 (C. Kaufman ed. Supp. 1984).

Boisen, 383 N.W.2d at 33–34. Courts have recognized certain interests attendant to a franchise that are protectible by restrictive covenants, such as good will, trade secrets, or the ability to secure a new franchise in the territory. See Carvel Corp. v. Eisenberg, 692 F.Supp. 182, 186 (S.D.N.Y.1988); South Bend, 572 F.Supp. at 213.

■■■ 6. Plaintiff has not demonstrated that Carter's operation of Sports Village constitutes unfair competition by reason of misappropriated good will or trade secrets. Good will is an asset or value arising from the likelihood that customers will continue to deal with an established concern or business. Vodra, 385 N.W.2d at 78. When he purchased the Salina Olympia Village store, Carter received a store with poor and declining sales. He was not provided a customer list or any instruction or training unique to running the Salina store. Plaintiff has not shown how its supervision or involvement as a franchisor of the Salina store generated any good will which Carter exploited when he moved to a new mall, opened a new store under a different name, changed some operations and clothing lines, and focused his efforts on team sales. The court is likewise persuaded that the plaintiff's asserted trade secrets are either not being used by Carter or not worthy of strict protection because they are within the general knowledge of retailers.

7. Another critical circumstance is that currently O.V. has no franchisees and apparently is not actively seeking any. O.V. has no interest in placing a new Olympia Village franchise store in Salina. The other interest asserted by O.V. for this restrictive covenant—to ensure the franchisee lives up to its bargain—is likewise unavailing under the facts of this case. Without any franchisees, the deterrent value of the restrictive covenant is lost. Instead, the interest asserted is to locate a new store owned by one of O.V.'s sister corporations, who are not named parties to the franchise agreement between O.V. and Carter. O.V. has failed to prove the restrictive covenant would protect a legitimate interest held by it. Consequently, any restrictions in space and time cannot be reasonably necessary.

8. In balancing the burden on the employee/covenantor against the business interest of the employer/covenantee, the court considers the following factors:

the degree of inequality in bargaining power; the risk of the covenantee losing customers; the extent of respective participation by the parties in securing and retaining customers; the good faith of the covenantee; the existence of sources or general knowledge pertaining to the identity of customers; the nature and extent of the business position held by the covenantor; the covenantor's training, health, education, and needs of his family; the current conditions of employment; the necessity of the covenantor

changing his calling or residence; and the correspondence of the restraint with the need for protecting the legitimate interests of the covenantee. (Citations omitted).

*Philip G. Johnson & Co. v. Salmen,* 211 Neb. 123, 317 N.W.2d 900, 904 (1982). These factors weigh heavily against enforcing the restrictive covenant. Carter was told the restrictive covenant was a term that could not be negotiated. The O.V. franchise did not entail the marketing or sales of particular goods or services designated by the brandname or trademark of Olympia Village. It is simply a retail sporting goods store chain. The Olympia Village franchise has not been shown to carry significant consumer recognition in Salina. Consequently, O.V.'s only role in securing or retaining customers was in its advertising efforts and general supervision of stores. Carter has worked at developing a customer list through his own marketing techniques. His knowledge of the retail market, in particular the various accounting methods, advertising plans and merchandising techniques, appears to be more attributable to his experience and training gained before he became a franchisee of O.V. and later from his own general experience in running a sporting goods store. Carter's only access to trade secrets was as a franchisee, and he paid a franchise fee for that access. Carter's chances of opening another retail business are practically foreclosed by the money judgment he has confessed in favor of O.V. Employment opportunities in Salina are depressed. The income generated from Sports Village is important to Carter's family. The enforcement of the restrictive covenant would place a burden on Carter that outweighs any present business interest of O.V.

IT IS THEREFORE ORDERED that plaintiff is denied all relief on its claim for specific performance or injunctive relief on the restrictive covenant appearing in the franchise agreement.

IT IS FURTHER ORDERED that the Clerk enter final judgment in this case.

IT IS FURTHER ORDERED that the plaintiff's motion to amend (Dk. 51) the journal entry of April 8, 1991, to enter judgment pursuant to Rule 54(b) is denied as the court has now directed the Clerk to enter judgment on the entire case.