**J.C. NICHOLS COMPANY, Plaintiff,**

v.

**EDDIE BAUER, INC., Defendant.**

No. 98–0370–CV–W–6.

United States District Court,
W.D. Missouri,
Western Division.

April 28, 1998.

Daniel M. Dibble, Amy Beth Marcus, Timothy K. McNamara, Lathrop & Gage, L.C., Kansas City, MO, for Plaintiff.

Leland H. Corley, Elizabeth D. Nay, Lewis, Rice & Fingersh, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

SACHS, District Judge.

Plaintiff J.C. Nichols filed suit on April 1, 1998, to enforce a lease restriction. Pending litigation it seeks a preliminary injunction. Defendant Eddie Bauer has moved the court

to stay or to dismiss Nichols' action based on Bauer's earlier-filed declaratory judgment suit in Kansas state court involving identical issues. After oral argument I denied Bauer's motion and proceeded to hear testimony and argument on the Nichols motion.

Nichols, a real estate owner and developer, and Bauer, a retailer, are parties to a 1992 lease agreement. The lease provided for Bauer to lease property on Nichols' Country Club Plaza, an upscale shopping area in Kansas City, Missouri, for the purpose of operating an Eddie Bauer Premier Store on the premises. The lease agreement contained a restrictive covenant which provides:

> Tenant further agrees that these Premises shall house the only "Eddie Bauer Premier Store" in the greater Kansas City metropolitan area which is defined as the five (5) county SMSA trade area of Jackson, Clay, Johnson, Platte and Wyandotte counties throughout the Primary Term and any Extension Terms of this Lease; and Tenant further agrees not to open any new "Eddie Bauer" stores of any kind anywhere in the metropolitan area except the 6–7,000 square foot store scheduled to open locally at Oak Park Mall in the fall of 1992, which may be renewed but the premises therein shall not be expanded.

The legality of the restriction has been in question for over four years. Bauer sought to renegotiate the restriction, but Nichols has been insistent on full protection of its contract rights. Despite the covenant, Bauer proceeded to construct a store in the Independence Center shopping area in Missouri and to enlarge the Oak Park Mall store in Johnson County, Kansas. Both stores are reportedly ready to open.

■ In evaluating a request for a preliminary injunction, the court considers (1) the probability of success on the merits, (2) the threat of irreparable harm to the moving party, (3) the balance between the potential harm and any injury that an injunction would cause to other interested parties, and (4) whether the public interest supports the issuance of an injunction. *Dataphase Systems,*

*Inc. v. C L Systems, Inc.,* 640 F.2d 109, 112 (8th Cir.1981) (en banc). No single factor is dispositive and all must be balanced to determine whether to grant the injunction. *Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Schimmel,* 128 F.3d 689, 692 (8th Cir.1997).

■ Nichols contends that, if a preliminary injunction is not granted, it will lose rentals on the Plaza. The rent Bauer pays Nichols is in part a function of Bauer's gross sales. Accordingly, if sales decrease as a result of increased competition from other Bauer stores, Nichols will suffer harm indirectly, although the direct sufferer will be Bauer itself, as operator of the Plaza store. Nichols also claims it will be harmed by the loss of business to its other tenants if Bauer is allowed to open competing stores and that its reputation would suffer as a result of the loss of exclusivity. According to Nichols, the Bauer Premier Store draws a substantial number of customers to the Plaza and has contributed to the Plaza's uniqueness in the Kansas City metropolitan area.

The hardship issue can best be examined as it relates to each proposed store.

Based on the testimony last week I conclude that the Independence Center store, as proposed, is likely to cause no appreciable hardship to Nichols—perhaps less than the Olathe outlet or discount store, a facility already opened in violation of the lease, which was not objected to by Nichols. The proposed store in Independence is a standard sportswear store, the type of relatively modest store used by Bauer until its recent, more ambitious projects.[1] It is some 16 miles from the Plaza and unlikely to divert potential Plaza customers, even those who may be interested in shopping at the large "Premier" store operated by Bauer in a prime location at the Plaza. The merchandise in the Premier store is far more diverse than in the standard store, and architecturally the Plaza store is described as luxurious.

Bauer's experience in Albuquerque, where similar competition between a Premier and a

---

1. Bauer has traditionally operated small sportswear stores. Recently, it began operating "Premier" stores, such as the Country Club Plaza store, which sell career clothing and home furnishings as well as sportswear.

standard store has been initiated, caused minimal loss of customers at the Premier store, and thus hardly measurable loss of rentals to the landlord under a percentage of gross receipts lease. Nothing at the Independence Center store would materially reduce the prestige of the Plaza store or of the Plaza itself. Whatever concern Nichols may have about the future of Independence Center as a competitor of the Plaza, that would not realistically relate to a new Bauer store there.

A new Bauer store would be beneficial to the Plaza store in minor ways, such as making prospective customers familiar with the Bauer name and stimulating advertising.

The new store's capital and inventory cost (exceeding $700,000) is not a pertinent factor, because those expenses were incurred with knowledge of the Nichols objection and the possibility of litigation. Bauer took its chances. Keeping the store closed would, however, deprive Bauer of anticipated profits of perhaps $100,000 annually while Nichols would gain nothing material. The balance of hardships comparison overwhelmingly favors Bauer.

█ Bauer would also be harmed far more than Nichols would be helped by the closing of the Oak Park Mall store pending litigation. Disregarding capital expenditures and the cost of inventory ($2.9 million), I do consider the lost profit estimates of $1.2 million annually if the doors remain closed. According to the current testimony there would be a likely loss to Nichols of only about $45,000 per year in rentals if the Kansas store opens. That ratio exceeds 25 to 1. If Nichols ultimately prevails in obtaining a permanent injunction, it could likely obtain lost rentals from breach

of contract at a rate of some $45,000 per year.[2] It would also ultimately achieve a store closing that would surely destroy any advantage temporarily obtained at the Oak Park Mall by the short-term operation of a Bauer store. At this stage, therefore, it would be very difficult to conclude that operation during litigation would result in significant irreparable harm to Nichols. The immediate balance of hardships, moreover, again strongly favors Bauer.[3]

The public interest issue is undeveloped, but somewhat favors Bauer because it will offer new employment opportunities, and the public would have the convenience of a Bauer store in Kansas and Independence. Nichols argues that enforcement of its contract rights would be a significant factor favoring an injunction pending litigation. It contends that "sending a message" to the business community is important. This assumes, however, that its contract right is a lawful one. I am not persuaded to reach that conclusion today, and I have a judicial duty not to jump to such a final conclusion. There has been no adequate development of the facts, and the pertinent law is both novel and elusive.[4]

I have speculated that there could be argument from Nichols that I should equate the public interest with opposition to centrifugal forces in the community, which foster urban sprawl and (as I suggested) the Balkanization or ghettoization of the metropolitan population. Civic-minded persons may suppose that to be the major potential public impact of a final ruling for Bauer, which might be used as a precedent. I doubt that the judicial role encompasses urban planning, even if I should personally regret the trend toward far-flung shopping centers.[5]

---

**2.** This is a rather good uncontested estimate, based on Bauer's reduced profits from the opening of an Oak Park type "multi-concept" store in Illinois in competition with a Premier store in the same area. Bauer acknowledges this comparison is "anecdotal," but it is the best now available.

**3.** Nichols contends that I could protect Bauer with a bond. This cuts against a contention that it will suffer irreparable injury if interim relief is denied. Whether or not interim damage is subject to ultimate recovery, I see no reason to allow more damage than is necessary.

**4.** I am told that similar restrictions in the leases of major shopping centers are fairly common, but most controversies are settled. Neither owners nor tenants have tested such restrictions as forcefully as in this case.

**5.** Moreover, Nichols may not be fairly depicted as a white knight. It was made clear that Nichols, for economic reasons, would resist any Bauer move to a revitalized downtown shopping area such as the Power & Light District.

If Nichols were sure to win this lawsuit there might be an overriding concern for prompt contract enforcement. I believe, however, that Nichols is quite likely to lose its challenge to the Independence Center store. The Oak Park Mall challenge is more likely to succeed, but for reasons discussed below my tentative view (which must remain tentative until after the case is ready for trial) is that Nichols can hardly claim a 50/50 chance of prevailing. That is considerably less than would mandate a quick interim injunction.

The parties have debated with some intensity whether the restriction, if otherwise sound, is geographically overbroad, in that it covers five counties comprising most of the metropolitan area.[6] Bauer claims a radius of a few miles would mark the limits of a reasonable competitive restriction to protect shopping centers. That may be true of small or medium-sized shopping centers.[7] The Plaza is, however, considered to be one of the ten most attractive and distinctive shopping centers in the country. Bauer concedes there is nothing comparable within the four nearest States. The Plaza draws about 40% of its customers from *outside* the metropolitan area. If it is entitled to protect a territory of prospective customers I believe a five county area is not an excessive request. Noncompete clauses on the sale of a business have been sustained under Missouri law for comparable areas and more. *Gold v. Holiday Rent–A–Car Int'l, Inc.,* 627 F.Supp. 280, 282 (W.D.Mo.1985) (75–mile radius restriction reasonably limited as to area); *Schnucks Twenty–Five, Inc. v. Bettendorf,* 595 S.W.2d 279, 286 (Mo.Ct.App.1979) (10 year 200–mile radius restriction held to be reasonable because it was not larger than reasonably necessary to protect the promisee). Bauer cites no authority for challenging the five county restriction in comparable circumstances.[8]

In this case I need not deal with areas of protection exceeding about 16 miles, the distance from the Plaza to the Independence Center. We can consider the limits of geographic protection more closely if and when Bauer seeks to open stores at Lone Jack, Missouri, and in the Bean Lake area.

Although I reject for now the argument most insistently presented by Bauer on the merits, I believe Nichols will have difficulty winning its challenge to the Oak Park Mall store, and that it is nearly futile to persist in challenging the Independence store. The reasons have been outlined already, regarding Independence, if, as I believe is necessary, a close study of the inherent reasonableness of the restriction is conducted.

The law strongly favors free competition, subject to reasonable contractual limits. What is reasonable is very difficult to define. Judges and lawyers are expected to know it when they see it. Evaluation of all pertinent circumstances must be made on an ad hoc basis, instance by instance. *See, e.g., Hall v. American Oil Company,* 504 S.W.2d 313, 319 (Mo.Ct.App.1973); *see also, Consultants & Designers v. Butler Service Group,* 720 F.2d 1553, 1557 (11th Cir.1983) (Alabama, New Jersey and Tennessee law). Reasonableness can only be "tested by the facts of the particular case." *Hedberg v. State Farm Mut. Auto. Ins. Co.,* 350 F.2d 924, 931 (8th Cir. 1965) (applying Minnesota law). The governing rule (if loose guidelines are worthy of that name) is set forth in the first part of the Restatement of Contracts, Second, § 188.[9]

6. If overbroad, I apparently have a duty under Missouri law to revise the limits downward. A ten mile restricted radius, for example, would free Bauer to operate both the stores in question.

7. *Compare, Casey's General Stores v. Campbell Oil,* 441 N.W.2d 758, 761 (Iowa 1989) (judicial imposition of three mile limit on competition affirmed, although "any determination of a reasonable geographic limit must be arrived at in a somewhat arbitrary manner" and another court "might conclude that a broader area of geographic protection is warranted.").

8. Nichols cites a Platte County, Missouri, ruling enjoining Barnes & Noble, which had challenged a 15–mile noncompete restriction in its Country Club Plaza lease. I agree with Judge Stuckey on this point. Other facts and arguments in that case are not available, because the parties settled and used a protective order against disclosures. The Platte County bookstore remains open.

9. (1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if

(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or

Although I do not find the pertinent Restatement language regarding the comparative weight of the hardships quoted in Missouri law, it is quoted frequently elsewhere, and Missouri cases refer to consideration of "undue hardship," which probably amounts to the same thing. *Superior Gearbox Co. v. Edwards,* 869 S.W.2d 239, 247 (Mo.Ct.App. 1993); *USA Chem, Inc. v. Lewis,* 557 S.W.2d 15, 24 (Mo.Ct.App.1977); *State ex rel. Schoenbacher v. Kelly,* 408 S.W.2d 383, 393 (Mo.Ct.App.1966). *Compare O.V. Marketing Associates, Inc. v. Carter,* 766 F.Supp. 960, 964–7 (D.Kan.1991) (Nebraska law—franchise competition).[10]

At first blush, the lost profit calculation at the Oak Park Mall, exceeding any loss to Nichols on a 25 to 1 ratio, seems to demand a ruling that the balance of hardships test is overwhelmingly favorable to Bauer, and thus makes the restriction unenforceable as applied to the Oak Park Mall. However, I doubt that the case can be kept quite that simple. In the usual situation of a buyer's contractual right to be free of competition from the seller of a business, I very much doubt that the fact that the seller may be able to show it could make a financial "killing" if freed from the restraint would mean that the killing must go forward, despite the contractual restraint. In other words, I am skeptical that in such a situation a balance of hardships test would be mechanically applied as might be inferred from the Restatement language.[11] On the other hand, the context of this case is quite different. The restriction in question essentially forbids Bauer from competing with *itself,* not Nichols, even if normal business considerations would favor such competition. This extraordinary intrusion in an internal business decision in favor of one whose interest in the decision is largely indirect and incidental probably deserves closer critical scrutiny than would be the case if Nichols itself operated the Bauer store on the Plaza. Bauer does not compete with Nichols. I believe the comparative weight of the hardships from enforcement or disallowance of the restriction may thus be applied more literally in the present context.[12] Apparently no cases consider this distinction and none can be cited to the contrary.

Recognizing the novelty of the distinction here posited, between restraining direct and indirect competition, it seems that we are dealing with a horse of a different color. Whether the courts are or should be colorblind in this situation remains to be seen.

The case at bar may also perhaps be analogized to a land-use restraint of competition, which has been met with judicial hostility in Missouri. *Dean v. Monteil,* 361 Mo. 1204, 239 S.W.2d 337 (1951); *Shepherd v. Spurgeon,* 365 Mo. 989, 291 S.W.2d 162 (1956); *Kerrick v. Schoenberg,* 328 S.W.2d 595 (Mo. 1959). The land-use restraint here is area wide, which arguably makes it even more objectionable than the restrictions in *Dean, Shepherd* and *Kerrick,* but on Nichols side it may be said that the restriction is on proper-

---

(b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

**10.** In the last-cited case, Nebraska law forbidding a restraint on "ordinary competition" (as contrasted with "improper and unfair competition") is mentioned. 766 F.Supp. at 965. Two appellate judges in Missouri recently repeated a rule forbidding enforcement of a restrictive covenant "merely to protect [a promisee] from the competition of an employee." *West Group Broadcasting Ltd. v. Bell,* 942 S.W.2d 934, 936 (Mo.Ct.App.1997). If this concept is not confined to employee restraints, it could significantly affect Nichols' chances here. There is nothing inherently improper or unfair in Bauer's opening new stores.

**11.** As Nichols points out, the Missouri Supreme Court took this view in *Osage Glass, Inc. v.*

*Donovan,* 693 S.W.2d 71, 75 (Mo. banc 1985). Contrary to Nichols, however, I doubt the Missouri court wished to establish a rule against all "balancing" or considering the equities. It concluded by saying that "courts should relieve [a promisor] of his voluntary obligation *only for a substantial reason."* 693 S.W.2d at 75 (emphasis added). Subsequent cases like *Superior Gearbox* are consistent with the Restatement balancing test. In fact the *Osage Glass* decision took into account the former employee's opportunity to exploit his skills on the Kansas side of the metropolitan area. 693 S.W.2d at 74.

**12.** Some might say that a "hardship" contemplates an event more onerous than loss of profits. That might be said of a buy-out restriction, as I suggest. But business executives and lawyers would probably classify loss of a year-end bonus as a "hardship." The meaning fluctuates as the context changes.

ty in general rather than Bauer property. So we are dealing with a restriction that evades all settled forms of analysis.[13]

But even if a balance of hardships test is used here, it is by no means certain that Bauer will prevail. Nichols asserts major intangible needs for its exclusive rights and those would receive close examination before a permanent injunction is denied. I suppose that exclusivity makes a dramatic difference in fashions, and Nichols is fighting to retain its status as the most fashionable shopping center in at least four States. Using an illustration that was mentioned during the hearing, one can well imagine that an extravagant party gown, perhaps purchased for one social affair, would lose its prestige status if another woman appeared wearing the same dress. The lack of exclusivity might result in embarrassment rather than pride. Nichols seemingly argues that the public may denigrate its Premier Eddie Bauer store if it had a twin at the Oak Park Mall. It might tend to make the Plaza look like any other major shopping center, particularly now that what is described as "the nation's premier retailer" has chosen the Oak Park Mall for its new Nordstrom store.

Bauer contends, however, that Nichols is greatly exaggerating the mystique factor of its Plaza store, and in any event I can anticipate further argument that the hardship calculation is not greatly altered by invoking the mystique theory. Even if further refinement of economic forecasts should show a hardship ratio closer to 5 or 10 to 1 (principally by factoring in some theory of lost business to the Plaza in general by reason of the Bauer store at the Oak Park Mall), it may be hard to persuade me that the uniqueness of the Premier store on the Plaza has such intangible effect as to justify overriding striking monetary imbalance.

Bauer testimony also tends to show that the Oak Park Mall store will be distinctly second-tier in its attractiveness, as compared with the Premier store on the Plaza. Whatever local boosting may have occurred, it is now explained that a "multi-concept store"

rather than a Premier store will be opened at the mall. Architectural expenses will be about two-thirds of those on the Plaza and the sportswear line (which gave Bauer its reputation) will be less complete. A Premier store has not been authorized at the Oak Park Mall. I am asked to infer that the public will realize that the Plaza store remains unique as Bauer's "flagship" store. That remains to be determined on better proof.

Bauer further contends that its Plaza store is not a "destination store" in the sense that it serves as a strong magnet to draw shoppers to the Plaza. It is not a Tiffany's or even a Nordstrom store, and thus the need for protection is said to be distinctly limited. Nichols indicated that it has one or more surveys showing what percentage of Plaza shoppers say they were drawn there by Bauer. No evidence has been introduced on that significant subject. Briefing by Nichols describes Bauer as "the second highest grossing concern on the Plaza." If so, Nichols may have an issue for development before trial.

Although both sides thus have substantial arguments regarding the ultimate ruling on the Oak Park Mall store, for the foregoing reasons it seems somewhat less than probable that Nichols will be able to persuade me to enjoin operation of that store as a means of enforcing its contract right, which currently seems unreasonably restrictive of competition in the context now before the court.

I conclude that the *Dataphase* factors clearly preclude issuance of a preliminary injunction. None of the factors can presently be called in favor of Nichols, although several may deserve further development.

The motion for a preliminary injunction is therefore DENIED.

---

**13.** Another curiosity, viewing the restriction as a variety of land-use restraint, is that the restraint crosses state lines. Whether the Kansas courts would be hostile to a Missouri contract limiting land use in Kansas is another unexplored issue.